The NEW YORK STATE BROADCAST-
ERS ASSOCIATION, Inc. and Met-
romedia, Inc., Petitioners,

v.

UNITED STATES of America and Fed-
eral Communications Commis-
sion, Respondents.

Nos. 633, 634, Docket 32981, 32982.

United States Court of Appeals
Second Circuit.

Argued June 24, 1969.

Decided Aug. 11, 1969.

Ephriam London, New York City, (John W. Tabner, Albany, Aaron Cantor, New York City, Franklin S. Bonem, on the brief), for petitioner The New York State Broadcasters Assn., Inc.

Robert A. Dreyer, Short Hills, N. J. (Alfred L. Schwartz, New York City, Thomas J. Dougherty, Washington, D. C., on the brief), for petitioner Metromedia, Inc.

Katrina Renouf, Washington, D. C. (Richard W. McLaren, Asst. Atty. Gen., Gregory B. Hovendon, Atty., U. S. Dept. of Justice, Henry Geller, Gen. Counsel, John H. Conlin, Associate Gen. Counsel, Federal Communications Commission, on the brief), for respondents.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Ruth Kessler Toch, Sol. Gen., Julius L. Sackman, Asst. Atty. Gen., filed an *amicus curiae* brief on behalf of the State of New York.

Before HAYS and FEINBERG, Circuit Judges, and JAMESON, District Judge.*

FEINBERG, Circuit Judge:

The New York State Broadcasters Association, Inc. and Metromedia, Inc. have petitioned for review of a declaratory ruling of the Federal Communications Commission on whether certain proposed broadcasts about the New York State Lottery would violate 18 U.S.C. § 1304, which prohibits broadcasting lottery information, and the Commission's regulations. The Commission specifically ruled as to some types of broadcasts but declined to do so with regard to others, relying instead on general statements of the purpose of the statute and regulations. For reasons set forth below, we hold that the declaratory ruling was incomplete and remand the matter to the Commission.

I

During its 1966 session, the New York State Legislature passed a measure that provided for a vote on a proposed amendment to the state constitution. The amendment authorized the creation of a state lottery and was approved by a substantial majority of New York voters in the November 1966 election. Thereafter, in April 1967, the Legislature passed the New York State Lottery Law, which provided for the sale of lottery tickets with the net proceeds of the sales to be used exclusively for educational purposes by state and local entities.

In June 1967 the Lottery commenced operation and in the meantime has become a familiar feature of the state landscape. Advertisements on billboards, in

---

* Senior District Judge of the District of Montana, sitting by designation.

newspapers and on public transportation posters proclaim the chance of a lifetime to help education and at the same time win a lottery prize. Despite such promotional efforts, however, the Lottery has been a disappointment to its supporters, and the state has for the most part had to look elsewhere for the revenues to pay the increasing costs of education. Whatever the reasons for the failure of the Lottery to produce the expected revenues, at least some people believe that if would be more successful but for the almost total absence of lottery news, information and advertising on television and radio. As a consequence, the state has sought to increase interest in the Lottery by using radio and television, and this appeal is one result of that effort.

Petitioner The New York State Broadcasters Association, Inc. is an organization of radio and television broadcasters whose members own 175 broadcast stations, all of which are licensed by the Commission. Petitioner Metromedia, Inc. is one of the licensed broadcaster members of the Association; it owns and operates radio and television stations in New York and elsewhere. According to petitioners' brief, Metromedia and other members of the Association have undertaken to broadcast advertisements and other information about the New York State Lottery if such broadcasts will not result in revocation of or inability to renew their licenses. However, until now they have refrained from making such broadcasts for fear of violating the anti-lottery provisions of 18 U.S.C. § 1304 and the corresponding FCC regulations.

On March 6, 1968, in an attempt to clarify the Commission's position on various types of broadcasts, petitioners filed a request for a declaratory ruling that 18 U.S.C. § 1304 and the regulations did not apply to broadcasts about the New York State Lottery. More specifically, petitioners requested assurances that no sanction would be applied against a broadcaster who "broadcasts or proposes to broadcast" any of the following:

(1) news reports (by aural or visual-and-aural means) of recent events about or relating to the Lottery. The term "news reports" is intended to include accounts suitable for inclusion as news in a newspaper, of events of current interest concerning the Lottery or its operations, or that have some connection with the Lottery. Attached as Appendix II are a number of articles and news items relating to the Lottery that were published in newspapers. The material is included to exemplify material deemed newsworthy by newspaper publishers, and by this inquiry the Association and Metromedia seek to determine if such reports, articles and news items may be broadcast by radio and television stations;

(2) news reports (by aural and visual-and-aural means) about illegal lotteries or other illegal gambling (but not including information tending to aid or facilitate the planning or operation of an illegal lottery);

(3) announcements (unpaid) of the places where Lottery tickets may be purchased, where, how and when winning tickets will be drawn, the amounts of the prizes, and how the proceeds of the sales of Lottery tickets are and will be distributed;

(4) advertisements of the Lottery;

(5) live broadcasts or simultaneous accounts of public events relating to the Lottery (for example, the broadcast by television of the drawing of the winning Lottery tickets by a prominent actress or by a government official, or the broadcast of a speech given by a public official such as the statement made by Joseph H. Murphy, New York State Commissioner of Taxation and Finance, before a United States Senate Committee, in which Commissioner Murphy described the operation of the Lottery and its purposes and stated that banks in selling

tickets for the Lottery were rendering a public service);

(6) interviews with persons holding winning Lottery tickets, relating, among other matters of general interest, to the number of tickets they purchased, their expectation of winning a prize, their reactions upon learning that they held winning tickets, and what they did or intend to do with the prize money;

(7) documentary programs on the Lottery, including such material as (a) statements by and questioning of public officials, prominent citizens and religious leaders who favor or oppose the Lottery, (b) descriptions (by aural and visual-and-aural means) of the way the Lottery operates and the proceeds are used, and (c) reporting the results of opinion polls on the Lottery;

(8) documentary programs exposing illegal lotteries, including such material as how and where they operate (and if it is the fact) the knowledge, indifference or participation of law enforcement officials, and showing effects of such illegal gambling on government, on the attitudes of the public, and on criminal conduct;*

(9) editorial comment on the Lottery, on its operation, on its purposes, on the promotion of the Lottery and on the public officials who administer it;

(10) panel discussions on various aspects of the Lottery, including those in which proponents and opponents, government officials who administer the Lottery, and others may participate, and in which questions and comments may be received from a studio audience.

\* To exemplify the programs that are the subject of the request for a ruling, there is attached as Appendix III the script of a program broadcast in 1963 entitled "Biography of a Bookie Joint."

Before the Commission, the State of New York supported petitioners' request

for a ruling and has filed an amicus brief in this court. In addition, the City of New York, interested both in its governmental and fiscal capacity and as a licensed broadcaster, filed a separate request and was a party before the Commission although it has taken no formal part in these review proceedings.

On September 25, 1968, the Commission issued its declaratory ruling,[1] holding that both the statute and the rules applied to state sponsored lotteries. With regard to the specific types of proposed broadcasts, the Commission ruled as follows:

7. \* \* \* It remains to be determined, in light of the language of the statute and rules, what, if anything, may properly be broadcast concerning this lottery. What is sought is an interpretation of the phrase "the broadcasting of, any advertisement of or information concerning any lottery," which is found in both the statute and the rules. It is clearly not practicable to attempt to rule on all of the various materials submitted by the parties in the absence of particular factual situations. However, some generalized guidance can be given.

8. The statute is plainly directed at material which promotes lotteries. This includes any material which, in the generally accepted sense of the terms, is intended to advertise, promote or encourage the successful conduct of a lottery. In particular, of course, no advertisements of lotteries may be broadcast.

9. On the other hand, the phrase "any information" about lotteries, should not, in our view, be construed to bar ordinary news reports concerning legislation authorizing the institution of a State lottery, or of public debate on the course State policy should take. Licensee editorials on public policy in this area are also not, in our view, proscribed by the statute, and our rules are not to be read as prohibiting them. In the category of

1. Two of the Commissioners were absent and one dissented.

news, any material broadcast in normal good faith coverage, which is reasonably related to the audience's right and desire to know and be informed of the day-to-day happenings within the community is permissible.

Thereafter, petitioners filed their request for review of the Commission's declaratory ruling. They argue principally that the ruling is unconstitutional as an infringement of first amendment rights in several respects. In response, the Government claims that petitioners are precluded from making their constitutional arguments because they did not raise them before the Commission and that the Commission's order was both constitutional and within the scope of the statute. We turn to the procedural question first.

## II

■ The Commission issued the declaratory ruling under review in the exercise of its "sound discretion to terminate a controversy or remove uncertainty." Such rulings are authorized by the Administrative Procedure Act, 5 U.S.C. § 554(e); and, when the issues decided could otherwise be adjudicated by the Commission, they are reviewable "as in the case of other orders." *Id.;* see *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 372, n. 3, 89 S.Ct. 1794, 1797, 23 L.Ed.2d 371 (1969). The declaratory ruling is thus an order reviewable in this court under 47 U.S.C. § 402(a). According to the Government, however, petitioners are precluded from making their constitutional arguments to us because they were not presented to the Commission either in the first instance or in a petition for reconsideration. Such a petition is made "a condition precedent to judicial review" by 47 U.S.C. § 405 "where the party seeking such review * * * relies on questions of fact or law upon which the Commission * * * has been afforded no opportunity to pass."

■ We do not agree with the Government that petitioners are prevented from seeking judicial review at this time. It is true that the literal words of section 405 provide for no exception, and two recent court of appeals decisions have applied the statute, or the general doctrine it embodies, in cases involving the scope of the Commission's power and the constitutionality of its actions. See *Conley Electronics Corp. v. FCC,* 394 F.2d 620 (10th Cir.), cert. denied, 393 U.S. 858, 89 S.Ct. 127, 21 L.Ed.2d 127 (1968); *Presque Isle TV Co. v. United States,* 387 F.2d 502 (1st Cir. 1967). In those situations, however, there was no attack on the constitutionality of an independent federal criminal statute, the issues involved basic broadcasting policies and the questions would probably have been resolved had they been presented to the Commission in the first instance. Thus, requiring exhaustion of administrative remedies served the usual goals of allowing agency expertise and discretion to be exercised and reducing the likelihood of additional litigation. Here, on the other hand, the Government apparently agrees that the Commission either would not or could not declare that 18 U.S.C. § 1304 is unconstitutional, as petitioners contend. Cf. *Public Utilities Commission v. United States,* 355 U.S. 534, 539–540, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); *Central Nebraska Public Power & Irr. Dist. v. FPC,* 160 F.2d 782, 783 (8th Cir.), cert. denied, 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 351 (1947). The Government does not suggest that it would have made any difference at all in the ruling of the Commission had the constitutional arguments been pressed by these petitioners. Indeed, the City of New York did explicitly raise those issues, so that they were before the Commission. Under these circumstances, we agree with petitioners that they were not required by 47 U.S.C. § 405 to continue to seek administrative relief before petitioning for review. See *Public Utilities Commission v. United States, supra;* 3 K. Davis, Administrative Law §§ 20.04, 20.06 (1958).

## III

In the Radio Act of 1927 and the Communications Act of 1934, Congress established a system of licensing and regulation to eliminate the chaos that threatened the new radio industry. In addition, Congress exercised to a limited extent the power to regulate and control the content of programming. Thus, in section 316 of the 1934 Act, Congress enacted a prohibition against broadcasting lottery information which, with changes in phraseology, is now contained in 18 U.S.C. § 1304:

> Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both. Each day's broadcasting shall constitute a separate offense.

In prohibiting the broadcasting of lottery information Congress was not acting in a vacuum; for more than one hundred years a prohibition on conducting a lottery by use of the mail facilities had existed.[2] See 18 U.S.C. §§ 1302, 1303. Similarly, prohibitions on importation and interstate shipment of lottery material also existed when section 1304 was enacted. See 18 U.S.C. § 1301. It is true that Congress has not attempted to prohibit the conduct of lotteries; with narrowly prescribed exceptions the states have done that. But Congress has exercised its power—the existence of which petitioners concede[3]—to inhibit lotteries and to aid the states by denying lottery promoters access to facilities over which the federal government has control.

It is in this light that the Commission's action must be considered —not as an exercise of the power to regulate broadcasting in the public interest necessitated by the nature and technology of broadcasting, but as enforcement of the clear congressional policy embodied in section 1304. Indeed, the Commission has the duty to enforce that policy in passing on a broadcaster's license, see 47 U.S.C. § 312(a) (6); FCC v. American Broadcasting Co., 347 U.S. 284, 289, 74 S.Ct. 593, 98 L.Ed. 699 (1954), and it has so informed broadcasters by the promulgation of regulations that essentially repeat the language of section 1304.[4] In its declara-

---

2. The first such prohibition was apparently enacted in 1827. See 4 Stat. 238, 239 (1827). See also 17 Stat. 283, 302 (1872); 19 Stat. 90 (1876); 35 Stat. 1088, 1129, 1130 (1909).

3. E.g., Reply Brief for Metromedia, Inc. at 10–11.

4. The regulations, 47 C.F.R. §§ 73.122, 73.292, 73.656, covering AM and FM radio and television broadcasts, respectively, are identical and provide as follows:

> Lotteries.
> (a) An application for construction permit, license, renewal of license, or any other authorization for the operation of a broadcast station, will not be granted where the applicant proposes to follow or continue to follow a policy or practice of broadcasting or permitting "the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes. (See 18 U.S.C. § 1304.)
> (b) The determination whether a particular program comes within the provisions of paragraph (a) of this section depends on the facts of each case. However, the Commission will in any event consider that a program comes within the provisions of paragraph (a) of this section if in connection with such program a prize consisting of money or thing of value is awarded to any person whose selection is dependent in whole or in part upon lot or chance, if as a con-

tory ruling, the Commission ruled that section 1304 and the regulations apply to legal state conducted lotteries as well as to lotteries that violate state law.[5] We agree with the Commission. Congress long ago stopped differentiating between legal and illegal lotteries, see 15 Op.Att'y Gen. 203–04 (1877); Commerford v. Thompson, 1 F. 417, 421 (C.C.Ky.1880); cf. United States v. Fabrizio, 385 U.S. 263, 87 S.Ct. 457, 17 L.Ed.2d 351 (1966), and as recently as 1967 enacted a law to prevent federally insured banks and savings institutions from selling lottery tickets for state operated lotteries. See 18 U.S.C. § 1306. There can thus be no doubt that Congress intended to prohibit broadcast of lottery information regardless of the legality of the lottery under local law. While petitioners challenge the wisdom of enforcing a policy that runs contrary to state efforts to experiment with a lottery as an alternate device for raising revenue, that issue is for Congress, not us, to resolve.

Petitioners claim, however, that even though Congress has the power and intended to apply some controls on the broadcasting of lottery information, section 1304, the regulations and the Commission's declaratory ruling violate the first amendment and deprive them of property without due process of law. The Government responds that the constitutionality of section 1304 is well established, citing American Broadcasting Co. v. United States, 110 F.Supp. 374, 389 (S.D.N.Y.1953), aff'd on other grounds sub nom. FCC v. American Broadcasting Co., *supra*; Donaldson v.

Read Magazine, Inc., 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628 (1948); Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092 (1904); and In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892). But according to petitioners, these cases are either inapposite or "reflect a hoary dogma that has long since evaporated."

Petitioners mount their attack in traditional free speech terms, citing well-known cases which protect freedom of expression.[6] Thus, they stoutly maintain that there can be no "official government view" which bans lottery information since the market place of ideas must be free to those who support lotteries. See Red Lion Broadcasting Co. v. FCC, *supra*, 395 U.S. at 389–392, 396–399, 89 S.Ct. 1806–1808, 1809–1811. But the argument is basically misplaced. Petitioners admit, for example, that the first amendment does not protect freedom to swindle even though words may be used to accomplish that result, a concession compelled by the Supreme Court's observation that:

> [T]he constitutional guarantees of freedom of speech and freedom of the press [do not] include complete freedom, uncontrollable by Congress, to use the mails for perpetration of swindling schemes.

Donaldson v. Read Magazine, Inc., *supra*, 333 U.S. at 191, 68 S.Ct. at 598. Moreover, invoking the specter of an official government view does not dispose of the real issues before us. There is an "official" government view as to the sale of narcotics, see 21 U.S.C. §§ 173, 174, the

dition of winning or competing for such prize, such winner or winners are required to furnish any money or thing of value or are required to have in their possession any product sold, manufactured, furnished or distributed by a sponsor of a program broadcast on the station in question.
See also 47 U.S.C. § 503(b)(1)(E) which authorizes the Commission to fine a licensee for violations of section 1304.

5. Although petitioners urged the Commission to rule that § 1304 does not apply to

state sponsored lotteries, they apparently do not press that point here.

6. E.g., Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Kingsley International Pictures Corp. v. Regents, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959).

offering of fraudulent securities, see 15 U.S.C. § 78j(b), the interstate transportation of wagering paraphernalia, see 18 U.S.C. § 1953, and the coercion of employees by employers, see 29 U.S.C. § 158(a) (1), to name only a few. And the view extends to communications which are designed to—and do—directly effectuate these unwanted results. Clearly an advertisement listing the names and addresses of sellers of narcotics or of fraudulent stock could constitutionally be banned. Of course, we do not suggest that lotteries are a swindle or that lotteries and uncontrolled sale of narcotics are equally deserving of condemnation, but Congress has the power to have a "view" as to these types of conduct and to take steps to inhibit each. Nor do we see a viable distinction here because there is legislative unanimity as to swindling or narcotics but a difference of opinion as to lotteries.

▮ The real point here is that we are not primarily in the realm of ideas at all but are chiefly concerned with speech closely allied with the putting into effect of prohibited conduct. This is not to say that the statute under attack does not raise first amendment issues. Thus, petitioners contend that section 1304 is unconstitutional on its face, arguing that its broad terms improperly inhibit "lawful communication unconnected with the operating of a lottery." It is obvious that a literal reading of the statute would support petitioners' challenge, since by its terms it punishes the broadcasting of "any * * * information concerning any lottery." This could include, for example, an editorial for or against continuing the lottery experiment started by New York State in 1967. However, we do not believe—nor did the Commission —that such a broad constuction of section 1304 is warranted. The section obviously prohibits a licensed broadcaster from conducting a lottery on the air. But that prohibition alone would be almost meaningless; by its very nature, a lottery could be promoted by broadcasting information about it with essen-

tially the same effect as conducting it. It is certainly reasonable that Congress acted to prohibit this possibility—the broadcasting of advertisements and information that directly promotes a particular lottery—and we think that the section must be strictly construed to go no further. The language of section 1304 itself indicates that Congress did not intend that the phrase "information concerning any lottery" be literally construed; otherwise there would have been no need to make certain that lists of winners not be broadcast. Moreover, the words of section 1304 were patterned after the language of the mail statute which had long been narrowly construed. See, e. g., Commerford v. Thompson, *supra*, 1 F. at 419–420; cf. United States v. Halseth, 342 U.S. 277, 279–280, 72 S.Ct. 275, 96 L.Ed. 308 (1952). And when it enacted section 1304 Congress also directed the Commission to respect first amendment values. See 47 U.S.C. § 326. Finally, as the Supreme Court has reminded us, section 1304 "is a criminal statute" and as such "is to be strictly construed." FCC v. American Broadcasting Co., *supra*, 347 U.S. at 296, 74 S.Ct. 593. For all of these reasons, we think that the phrase "information concerning any lottery" refers only to information that directly promotes a particular existing lottery. As we have construed it, section 1304 neither improperly restricts broadcasters to an official government view nor inhibits the free expression of ideas by reason of its overbreadth. Cf. American Broadcasting Co. v. United States, *supra*, 110 F. Supp. at 389. Thus, petitioners' constitutional attacks must fail.

### IV

▮ What remains is to consider the validity of the Commission's declaratory ruling in light of the above discussion. Petitioners complain about the order's lack of specificity as well as the Commission's failure to rule on a number of the requests made to it, as set forth on pages 992–994 *supra*. We think these concerns are to some extent justi-

fied. There have apparently never been any prosecutions for violations of section 1304, and we find no other judicial opinion explicitly interpreting the "information concerning" language of the statute. In view of this, and because of the great interest broadcasters have in not jeopardizing their licenses, we believe that the proper course is to set aside the Commission's declaratory ruling to allow it to reconsider petitioners' requests in light of this opinion.

A. *Advertisements and announcements.*

In their specific requests, petitioners sought rulings on whether broadcasts are permitted of (4) advertisements of the New York State Lottery or (3) "announcements (unpaid) of the places where Lottery tickets may be purchased, where, how and when winning tickets will be drawn, the amounts of the prizes, and how the proceeds of the sales of Lottery tickets are and will be distributed." The Commission answered no as to (4), but its ruling as to (3) is less clear. From the papers before us, we assume that the only difference between items (3) and (4) is that advertisements are paid for and announcements are unpaid. In its ruling, the Commission stated that the prohibition of "material which promotes lotteries" includes "any material, which, in the generally accepted sense of the terms, is intended to advertise, promote or encourage the successful conduct of a lottery." This appears to be broader than our construction of section 1304, which is that the statute is intended to reach only advertisements or information that directly promote a lottery. Thus, an announcement that a specified number of schools had been built with funds from the Lottery might generally "encourage" the conduct of the Lottery, but we would not think that it directly promotes it. However, the contrary would be true if there were coupled with the announcement a plea to buy tickets or information as to when and how to make a purchase. There is a difference between information directly promoting a lottery and information that is simply "news" of a

lottery. If a "news" item has the incidental effect of promoting a lottery, it is not banned; but if a lottery advertisement or announcement contains "news," such as the amount a lottery realized for education, it would nonetheless be banned. We are aware that at times the line drawn may be thin, but this will be the unusual rather than the common case because advertisements and announcements will ordinarily be more direct and exhortative. We would expect the Commission to apply its expertise to the problem. In any event, although we think that even under our narrow construction of section 1304 the Commission's ruling as to item (4) would in almost every instance be correct, we believe that petitioners are entitled to more specific guidance as to (3) and the assurance that as to both items the Commission is applying the proper test.

■ Finally, petitioners complain that the Commission's ban on all advertisements cannot stand in the light of the Supreme Court's decision that paid advertisements "on behalf of a movement whose existence and objectives are matters of highest public interest and concern" are entitled to full constitutional protection. New York Times Co. v. Sullivan, 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964). While we agree with that statement of the law, petitioners are incorrect in claiming that all Lottery advertisements qualify because they seek public participation in a venture affecting the welfare of New York residents. We believe that petitioners' requests as to items (3) and (4) and the Commission's ruling on them envisioned advertisements or announcements of the usual Lottery promotion type. To the extent that information of public interest and concern was to be conveyed, it was wholly incidental and subordinate to the promotion and thus properly prohibited. See Valentine v. Chrestensen, 316 U.S. 52, 55, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). Of course, petitioners and others are free to request rulings on material that meets the *Sullivan* test; and, if they do, we be-

lieve and the Government agrees that nothing in section 1304 or the Commission's declaratory ruling prohibits such broadcasts.

B. *News broadcasts.*

 In requests (1), (2), (5), (6), (7), (8), and (10), petitioners described general and specific types of news broadcasts. As far as we can tell, the Commission did not rule precisely on any of them although it did state that reports on legislation or public debate on "the institution of a State lottery" are not banned. While we agree as to those specific rulings, there exists a possible implication that other types of news reports are not equally outside the scope of section 1304. This is especially true in the light of a prior letter from the Commission's Secretary, casting doubt on the broadcast of "legitimate news" about the New Hampshire lottery and indicating that section 1304 permits only news which is *"incidentally* connected with a lottery." We believe that any such implication should be disclaimed by the Commission and that section 1304 prohibits only so-called news that directly promotes the Lottery, e. g., broadcasting lists of winners. As to these, Congress has already made the reasonable determination that such information would be direct promotion of the Lottery.[7] On the other hand, an interview by a television reporter with an excited winner— the counterpart of a newspaper feature story—would seem to us to be legitimate news and an indirect promotion at best. In any event, broadcasters in all fairness should be informed of the scope of the prohibition as specifically as possible. The Commission apparently agrees since it has indicated doubts in another context about imposing liability on a licensee in the absence of prior Commission or judicial decisions. See 32 Fed. Reg. 10303, 10304 (1967). Because of this, we hope that the Commission will take the opportunity to rule specifically on all or most of petitioners' requests— including whether sample newspaper re-

ports or stories submitted to it by petitioners would be permitted on radio and television—with whatever qualifications are appropriate in the light of this opinion.

C. *Editorials.*

The only one of petitioners' specific requests which remains to be discussed, number (9), referred to "editorial comment on the Lottery." Here too the ruling of the Commission specifically covered only editorials regarding a state's lottery policy. However, there should be no implication that other editorials by licensees are affected. In general, we do not believe that section 1304 was intended to reach fair editorial comment at all and should be read as a ban only if the editorial format is used as a sham to avoid the prohibition on direct promotion of the Lottery.

The declaratory ruling of the Commission is set aside and the case remanded to the Commission for reconsideration and decision in conformity with this opinion.