**S. P. S. CONSULTANTS, INC., and all others similarly situated, Plaintiffs,**

v.

**Louis J. LEFKOWITZ, Attorney General of the State of New York, Frank S. Hogan, District Attorney of New York County, Defendants.**

**Martin S. MITCHELL et al., Plaintiffs,**

v.

**Louis J. LEFKOWITZ, Attorney General of New York, et al., Defendants.**

**Nos. 71 Civ. 2931, 71 Civ. 2990.**

United States District Court,
S. D. New York.

Oct. 5, 1971.

Kimmelman, Sexter & Sobel, New York City, for plaintiffs S. P. S. Consultants, Inc.

Richard E. Pollinger, New York City, for plaintiffs Martin S. Mitchell and others; Arthur H. Sobel, Kenneth Rome, Peter Szabadi, Roy Lucas, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., Mark T. Walsh, Asst. Atty. Gen., Jonathan Trumbull, Albany, of counsel.

Before FEINBERG, Circuit Judge, and BONSAL and WYATT, District Judges.

## OPINION

BONSAL, District Judge.

These are companion actions in which plaintiffs, S.P.S. Consultants, Inc. in 71 Civ. 2931 ("S.P.S.") and Martin S. Mitchell, Mitchell Referral Service, Inc. and Sandra King in 71 Civ. 2990 ("Mitchell") challenge the constitutionality of Article 44 of the New York Public Health Law, McKinney's Consol. Laws, c. 45, which became effective on July 1, 1971.

On July 8, 1971, plaintiffs' motion to convene a Three-Judge Court, pursuant to 28 U.S.C. §§ 2281 and 2284, was granted, and plaintiffs' application for a temporary restraining order enjoining enforcement of section 4401 of Article 44, which prohibits the for-profit "referral or recommendation of persons to a physician, hospital, health related facility, or dispensary for * * * medical care or treatment," was denied. (See memorandum decision filed July 8, 1971, 333 F. Supp. 1370.)

On August 16, 1971, this court heard argument on plaintiffs' motion for a preliminary injunction enjoining the enforcement of section 4401 and the defendants' motion for judgment on the pleadings. The parties filed affidavits, but no testimony was taken.

Plaintiffs S.P.S. and Mitchell are corporations organized for profit, having as their purpose the dissemination of information as to the availability of abortions in the State of New York. Their services include dissemination of information as to the availability of facilities, the making of travel arrangements for patients referred to them by out-of-state doctors, and arrangements to have the abortions performed by licensed physicians in medical facilities within this State. Plaintiff Mitchell is the president of Mitchell, and plaintiff Sandra King availed herself of the services of Mitchell in March of 1971. Both S.P.S. and Mitchell were organized after the enactment of the 1970 New York Abortion Law.

Prior to July 1, 1971, S.P.S. charged a fee of $75 for its service of arranging travel and hotel accommodations and an appointment at an abortion facility for an out-of-state resident seeking an abortion. In addition, S.P.S. provided its clients with information concerning probable expenses and the availability of facilities. Mitchell offered essentially the same services as S.P.S.; however, its clients were assured a set price of $300 for the abortion. Mitchell's fee, which varied according to the type of abortion involved, was included in the set price of $300. Both S.P.S. and Mitchell advertised their services by direct mail, in newspapers and on television.

Section 4400 of Article 44, entitled "Legislative findings and statement of policy," reads as follows:

"The security of the health and welfare of the residents of this state requires, that the utmost attention be given to assure that persons seeking medical care and treatment in this state receive adequate care rendered within the standards of ethics and public policy applicable to all practices of medicine. Medical referral services, organized as profit making enterprises within this state, have been found to be engaged in the practice of medicine, have been sharing fees received for referrals with doctors and hospitals to whom patients are referred, have been otherwise compensating doctors and hospitals for accepting patients referred to them, have been giving medical advice by telephone to persons seeking referrals and have been advertising their services, all in violation of the standards of ethics and public policy applicable to the practice of medicine and which would be violations of standards of professional conduct if the acts were performed by physicians. Such profit making referral services have consistently engaged in practices inimical to the public interest which would be prohibited to physicians and have engaged in relationships with physicians which are in violation of the laws and public policy of this state and which have permitted physicians to benefit indirectly from acts and practices which would be prohibited to them directly. It is hereby declared to be the public policy of this state that the public health, safety and welfare of the citizens of this state require that such profit making medical referral service organizations be declared to be invalid and unlawful in this state."

Section 4401, the constitutionality of which is attacked by the plaintiffs, provides as follows:

"§ 4401. Medical referral service businesses prohibited. 1. No person, firm, partnership, association or corporation, or agent or employee thereof, shall engage in for profit any business or service which in whole or in part includes the referral or recommendation of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment of any ailment or physical condition. The imposition of a fee or charge for any such referral or recommendation shall create a presumption that the business or service is engaged in for profit.

"2. No physician, hospital, health related facility or dispensary shall en-

ter into a contract or other form of agreement to accept for medical care or treatment any person referred or recommended for such care or treatment by a medical referral service business located in or doing business in another state if the medical referral service business would be prohibited under this section if the business were located in or doing business in this state."

Section 4402 provides that a violation of the statute shall constitute a misdemeanor punishable by imprisonment for not more than one year or a fine of not more than $5,000, or both, and authorizes the Attorney General to institute proceedings to enjoin any violation of the statute. Section 4403 exempts persons, agencies, associations, or corporations not organized for pecuniary profit or financial gain, and tax exempt charitable corporations, from the prohibition of the statute.

Plaintiffs contend that section 4401 abridges their First Amendment rights to disseminate information concerning the availability of health care facilities and the public's right to receive such information. Plaintiffs also contend that section 4401 violates their Fourteenth Amendment rights by permitting non-profit agencies to perform services which it forbids profit agencies from performing.

■ Section 4401 does not prohibit the plaintiffs from disseminating information for a fee concerning the availability of health care facilities. It merely prohibits them from referring or recommending persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment. Accordingly, if the plaintiffs supply lists of physicians and facilities performing abortions, which lists are not so selective as to make actual recommendation or referral of a particular physician or facility a justifiable inference therefrom, their activities would not violate the statute. While the inability to make referrals to a particular physician or facility may affect the profitability of plaintiffs' businesses, it does not abridge their First Amendment rights. As the Court noted in Zemel v. Rusk, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965), "There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."

Plaintiffs' reliance on the lawyer referral cases, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); United Mine Workers of America, Dist. 12 v. Illinois State Bar Association, 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) and United Transportation Union v. State Bar of Michigan, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed. 2d 339 (1971), is misplaced as these cases do not reach direct solicitation to the public for profit. See NAACP v. Button, *supra*, 371 U.S. at 442–443, 83 S.Ct. 328. As the Court said in United Transportation Union v. State Bar of Michigan, *supra*, 401 U.S. at 585, 91 S.Ct. at 1082, these cases stand for the proposition that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."

Plaintiffs urge that the distinction between profit and non-profit referral agencies is arbitrary in view of the statement of policy in section 4400. Moreover, plaintiffs contend that the state must show a compelling state interest to justify the distinction drawn between profit and non-profit agencies.

■ The state, in exercising its police power in the field of medicine, may ban commercial practices which it believes violate its public policy. Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570,

79 L.Ed. 1086 (1935). In *Semler, supra* at 612, 55 S.Ct. at 572, the Court stated that the profession of medicine demands "different standards of conduct from those which are traditional in the competition of the marketplace."

The standard to be applied in determining whether section 4401 violates the equal protection clause is set out in McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 809, 89 S. Ct. 1404, 1408, 22 L.Ed.2d 739 (1969), as follows:

"The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside only if no grounds can be conceived to justify them. See McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961); Kotch v. Board of River Port Pilot Commissioners, 330 U.S. 552 [67 S.Ct. 910, 91 L.Ed. 1093] (1947); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61 [31 S.Ct. 337, 55 L.Ed. 369] (1911). With this much discretion, a legislature traditionally has been allowed to take reform 'one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563] (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked. See Ozan Lumber Co. v. Union County National Bank, 207 U.S. 251 [28 S.Ct. 89, 52 L.Ed. 195] (1907)."

Prior to the enactment of Article 44, the New York State Senate Standing Committee on Health conducted hearings to determine the advisability of amendments to New York's abortion law which became effective in 1970, and the New York State Attorney General conducted hearings for the purpose of determining whether profit abortion referral agencies should be regulated or outlawed. The first of the Senate hearings was held in Albany on February 10, 1971, followed by a hearing in New York City on February 19, 1971. At these hearings, interested persons were invited to testify. Among others appearing were John Alden Settle, Jr., president of Abortion Information Agency, Inc., a profit agency, and Miss Sharon C. Peters, its executive director. This agency was the subject of an injunction suit in New York County, State of New York v. Abortion Information Agency, Inc., 323 N.Y.S.2d 597 (Sup.Ct., N.Y.Co., Asch, J., 1971), aff'd, (1st Dept. June 1971) (Steuer, J., dissenting). In that litigation, it appears that this corporation between July 17, 1970 and February 28, 1971 had a gross income of $5,500,000, of which $1,200,000 represented fees charged to clients. Another witness, Mr. Edgar Arenz testified that he was the president of four corporations which operated abortion referral services. The "medical director" of one of these corporations was said to have earned as much as $1600 in one day for performing abortions, in addition to which he received $2,000 a month for his services as medical adviser, and as a 30% stockholder he received $19,200 in dividends paid over a several-month period. There was also evidence that the profit agencies engaged in substantial advertising. Arenz stated that he had an advertising budget of $1,000 a week and had advertised in approximately 100 college newspapers throughout the country.

Dr. Morton A. Schiffer, Chief of the Department of Obstetrics and Gynecology at the Jewish Hospital and Medical Center of Brooklyn, testified that "[t]he early experience with out of state abortions is that the abortion middlemen have arrived on the scene. These agencies are

not necessary and prey on the unsuspecting anxiety laden person." Alfred Moran, Executive Vice President of Planned Parenthood, New York City, testified, " * * * the commercial referral services should be barred from operation in the State of New York. I think they are superfluous, I think they are immoral, and unethical, and unnecessary." Following the first hearing in Albany, Senator Lombardi made the following observation:

"Because New York State has the most liberal abortion statute within the Continental United States, thousands of women from all over the country are coming into New York State, and particularly New York City, for abortions. We were astonished to learn at our Session last week that most of these women come here through referral agencies who advertise nationally. These agencies, for a sizable fee, make all abortion arrangements for a patient. We also learned that certain hospitals give discounts to these lucrative, profit-making organizations. Thus, at the expense of desperate, frightened women these agencies are making a huge profit— some, such a huge profit that our Committee members were actually shocked."

There was evidence that the personnel of the profit agencies lacked any medical training and followed a prepared script in making referrals for out-of-state patients as " * * * a woman talking to another on the phone * * ". The Abortion Information Agency receives 200–400 telephone calls a day, mostly from out of state. In its brief before us, plaintiff S.P.S. states that 95% of its telephone calls originate out of state. There was evidence that the profit agencies have no follow up procedure after the abortion is performed although Abortion Information Agency claims that it orally asks its clients to let it know "how it went".

There was no evidence of fee splitting by the profit agencies, and the witnesses from these agencies deny that there was any. The legislature, however, could reasonably conclude that profit agencies would have a much greater incentive to split fees with physicians than would non-profit agencies. Moreover, in State of New York v. Mitchell and Mitchell Referral Services, Inc. (two of the plaintiffs in the case at bar were enjoined from maintaining a clinic in Niagara Falls, New York), 66 Misc.2d 514, 321 N.Y.S.2d 756 (Sup.Ct., 1971), Judge Stiller of the Supreme Court, Niagara County, suggested that Mitchell did split fees.

The Attorney General of New York held hearings on February 11 and 26, 1971 in New York City, at which witnesses complained of: (1) excessive fees being charged by the profit agencies, (2) fee splitting, (3) advertising practices, (4) laymen giving medical advice over the telephone, (5) the charging of unitemized fees for both abortion and referral.

While the testimony at these hearings indicated that immediately following the enactment of the abortion law the profit agencies may have rendered a useful service in providing information as to the availability of abortion services and that the non-profit agencies were lacking in this respect, there was evidence that the New York non-profit agencies are improving their services in this regard, as exemplified by the Planned Parenthood circulars printed in English and Spanish which were handed up at the argument. In any event, the legislature could well find on the basis of the hearings that the commercial activities of the profit agencies, in making direct referrals to selected medical facilities, were inimical to the public interest and violated the public policy of the state. The legislature could also find a valid distinction between the activities of the profit agencies and of the non-profit

agencies, so that only the former need be banned.

Plaintiffs contend that the non-profit agencies are doing exactly the same thing as the profit agencies, and there was evidence at the hearings that they also answer telephone calls in much the same way as the profit agencies and make referrals. The plaintiffs also supplied affidavits of people who had monitored telephone calls of the non-profit agencies. On the other hand, the non-profit agencies are not subject to the commercial pressures so dramatically developed during the Senate Committee Hearings. Moreover, as pointed out in Williamson v. Lee Optical of Oklahoma, Inc., *supra*, 348 U.S. at 489, 75 S.Ct. at 465, "The legislature may select one phase of one field and apply a remedy there, neglecting the others. AFL v. American Sash & Door Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination." In the same case, the Court held that the state may outlaw commercial practices in the medical field "to free the profession, to as great an extent as possible, from all taints of commercialism." (p. 491, 75 S.Ct. p. 466).

Therefore, the court finds that the distinction made by the statute is rationally related to a legitimate state end, McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 303 (1961); Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957); Johnson v. New York State Education Department, 449 F.2d 871 (2d Cir. 1971), and that it meets the guidelines laid down in McDonald v. Board of Election Commissioners of Chicago, *supra*.

The plaintiffs' motion for a preliminary injunction is denied and the defendants' motion for judgment on the pleadings is granted.

It is so ordered.