## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

JEFFERY C. BIGELOW, ETC. v. COMMONWEALTH OF VIRGINIA.

September 1, 1972.

Record No. 7972.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*John C. Lowe; F. Guthrie Gordon, III (Lowe & Gordon,* on brief), for plaintiff in error.

*D. Patrick Lacy, Jr., Assistant Attorney General (Andrew P. Miller, Attorney General; William G. Broaddus, Assistant Attorney General,* on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

Jeffery C. Bigelow[1] was tried by the court, sitting without a jury, and convicted of encouraging or prompting the procuring of abor-

---

[1] Also shown as Jeffrey C. Bigelow.

tion by publication, advertisement, sale, or circulation of the Virginia Weekly, a newspaper published in Charlottesville, in violation of Code § 18.1-63. He was fined $500, $350 of which was suspended upon condition that he not further violate § 18.1-63. We granted him a writ of error.

The case comes before us upon a stipulation of fact and certain exhibits. Bigelow had direct responsibility for the publication and circulation in Albemarle County of the February 8, 1971 issue of the Virginia Weekly. The issue contained the following advertisement:

---

UNWANTED PREGNANCY
LET US HELP YOU

Abortions are now legal in New York.
There are no residency requirements.

FOR IMMEDIATE PLACEMENT IN ACCREDITED
HOSPITALS AND CLINICS AT LOW COST

Contact

WOMEN'S PAVILION
515 Madison Avenue
New York, N. Y. 10022

or call any time

(212) 371-6670 or (212) 371-6650
AVAILABLE 7 DAYS A WEEK

STRICTLY CONFIDENTIAL. We will make
all arrangements for you and help you
with information and counseling.

---

The questions presented on this appeal are whether Bigelow violated Code § 18.1-63 by publishing the advertisement, and if so, whether the statute is constitutional under the First Amendment to the Constitution of the United States and Article 1, § 12, of the Constitution of Virginia.

Section 18.1-63, Code of 1950, as amended, 1960 Repl. Vol., provided:[2]

---

[2] Section 18.1-63 was amended by Acts of 1972, ch. 725, at 1019.

"If any person, by publication, lecture, advertisement, or by the sale or circulation of any publication, or in any other manner, encourage or prompt the procuring of abortion or miscarriage, he shall be guilty of a misdemeanor."

Bigelow first contends that the advertisement was not in violation of § 18.1-63. He says the advertisement did not encourage or persuade women to obtain abortions, but instead merely informed those who had already rejected their pregnancies that services were available for legal abortions. We do not agree. The language of the advertisement clearly exceeded an informational status when it offered to make all arrangements for immediate placement in accredited hospitals and clinics at low cost. It constituted an active offer to perform a service, rather than a passive statement of fact. By offering to arrange for the placement of pregnant women, the advertisement amounted to an encouragement or a prompting to procure an abortion, and thus was violative of the language and intent of Code § 18.1-63.

This brings us to the question of the constitutionality of Code § 18.1-63. Bigelow contends that the statute infringes the First Amendment rights of free speech and free press and is, therefore, unconstitutional.

We reject this contention. We are not dealing here with the traditional press role of disseminating information and communicating opinion, but with a commercial advertisement promoting the services of an abortion referral agency. That this is true is shown by the advertisement itself and by an exhibit which is in the record.

The advertisement holds out to pregnant women the offer, by the Women's Pavilion, to make all arrangements and to secure immediate placement in a hospital or clinic for an abortion. All this, the advertisement says, will be done "at low cost." The printed words, whether read literally or rhetorically, can only mean that the agency, for a fee, will make the necessary business arrangements with doctors and hospitals or clinics to secure an abortion for the customer. Thus, the commercial nature of both the advertiser and the advertisement is patently revealed.

That is enough by itself, but an exhibit in the record in the form of one of the issues of the publication in question provides additional proof. The May-June, 1971 issue of the Virginia Weekly, in an

article entitled "abortion rap," reported the arrest of staff members for publishing in the February issue the advertisement in dispute. In the same article, it was stated, in apparent apology, that the "*Weekly* collective has since learned that this abortion agency," obviously meaning the Women's Pavilion, "as well as a number of other commercial groups are charging women a fee for a service which is done free by Women's Liberation, Planned Parenthood, and others."

The question becomes whether such an advertisement may be constitutionally prohibited by the state. We answer the question in the affirmative.

In a case directly in point, *United States* v. *Hunter*, 459 F.2d 205 (4th Cir. 1972), the government sought to enjoin Hunter, a newspaper publisher, from carrying advertisements in his paper allegedly violative of a section of the Civil Rights Act of 1968, which prohibits advertising of an intent to discriminate in the sale or rental of a dwelling. 42 U.S.C. § 3604(c). The district court held that the Act did not contravene the First Amendment and that a court might, therefore, constitutionally enjoin a newspaper from printing advertisements in violation of the statute. In affirming, the Fourth Circuit stated:

> "The [district] court's conclusion is supported by an unbroken line of authority from the Supreme Court down which distinguishes between the expression of ideas protected by the First Amendment and commercial advertising in a business context. It is now well settled that, while 'freedom of communicating information and disseminating opinion' enjoys the fullest protection of the First Amendment, 'the Constitution imposes no such restraint on government as respects purely commercial advertising.'" 459 F.2d at 211 (footnotes omitted).

In reply to Hunter's contention that the above rule did not apply to newspapers, the court stated that "a newspaper will not be insulated from the otherwise valid regulation of economic activity merely because it also engages in constitutionally protected dissemination of ideas." 459 F.2d at 212. And at another point the court said that if "an individual advertiser has no constitutional or statutory right to circulate a discriminatory housing advertisement, a newspaper can stand in no better position in printing that unlawful advertisement at the individual's request." 459 F.2d at 214.

*Hunter* is but one of numerous cases upholding the power of government to regulate commercial advertising. The source of authority for these decisions is *Valentine* v. *Chrestensen,* 316 U.S. 52 (1942). In that case, the United States Supreme Court had before it the question of the constitutionality of a New York City ordinance which forbade distribution in the streets of commercial and business advertising matter. Chrestensen had attempted to distribute a double-faced handbill, one side advertising an exhibit for profit and the other expressing protest against the city's efforts to thwart the exhibit. The police interfered with the distribution, and Chrestensen sought to enjoin Valentine, the police commissioner, from such interference. The district court granted the injunction, and the circuit court affirmed. However, the Supreme Court reversed, holding that the First Amendment imposed no restraint upon proscription by states and localities of purely commercial advertising and that it made no difference that one side of Chrestensen's handbill contained "matter proper for public information." 316 U.S. at 55.

Other cases upholding the right of government to regulate commercial advertising are: *New York State Broadcasters Ass'n* v. *United States,* 414 F.2d 990, 998 (2d Cir. 1969), *cert. denied,* 396 U.S. 1061 (1970); *Banzhaf* v. *F.C.C.,* 132 U.S. App. D.C. 14, 31-35, 405 F.2d 1082, 1099-1103 (D.C. Cir. 1968), *cert. denied sub nom. Tobacco Institute, Inc., Et Al.* v. *F.C.C.,* 396 U.S. 842 (1969); *Capital Broadcasting Company* v. *Mitchell,* 333 F. Supp. 582 (D.D.C. 1971) (three-judge court), *aff'd sub nom. Capital Broadcasting Co. Et Al.* v. *Acting Attorney General Et Al.,* 405 U.S. 1000 (1972); *Wirta* v. *Alameda-Contra Costa Transit District,* 64 Cal. Rptr. 430, 434, 434 P.2d 982, 986 (1967).

The rule that the First Amendment does not prohibit government regulation of commercial advertising is especially applicable where, as here, the advertising relates to the medical-health field. *Patterson Drug Company* v. *Kingery,* 305 F. Supp. 821, 825 (W.D.Va. 1969) (three-judge court); *United Advertising Corp.* v. *Borough of Raritan,* 11 N.J. 144, 152, 93 A.2d 362, 366 (1952); *Planned Parenthood Committee* v. *Maricopa County,* 92 Ariz. 231, 240, 375 P.2d 719, 725 (1962).

Regulations affecting advertising in the medical-health field have also been attacked on Fourteenth Amendment grounds. The attacks have been rejected. *Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 490 (1955); *Semler* v. *Dental Examiners,* 294 U.S. 608, 610-11

(1935); *Patterson Drug Company* v. *Kingery, supra,* 305 F. Supp. at 823-25; *Ritholz* v. *Commonwealth,* 184 Va. 339, 369, 35 S.E.2d 210, 224 (1945); *Goe* v. *Gifford,* 168 Va. 497, 501-03, 191 S.E. 783, 784-85 (1937).

Focusing attention upon Code § 18.1-63, the statute here in question, we emphasize that it deals with abortion, a matter vitally affecting public health and welfare and in the important realm of medicine. It is clearly within the police power of the state to enact reasonable measures to ensure that pregnant women in Virginia who decide to have abortions come to their decisions without the commercial advertising pressure usually incidental to the sale of a box of soap powder. And the state is rightfully interested in seeing that Virginia women who do decide to have abortions obtain proper medical care and do not fall into the hands of those interested only in financial gain, and not in the welfare of the patient.

One need only look at the experience in New York State following its legalization of abortion to become convinced of the necessity for and the reasonableness of the advertising legislation in question. In *S.P.S. Consultants, Inc.* v. *Lefkowitz,* 333 F. Supp. 1373 (S.D.N.Y. 1971) (three-judge court), the court upheld, against First and Fourteenth Amendment attacks, a New York statute prohibiting the operation of for-profit abortion referral agencies. The opinion discloses that one such agency received from 200 to 400 telephone calls per day, mostly from out-of-state, and that 95 percent of the telephone calls of another agency came from nonresidents. One agency collected $5,500,000 in the first eight months after abortion was legalized, of which sum $1,200,000 was the agency's portion. There was evidence of substantial advertising by the for-profit agencies. One had an advertising budget of $1,000 a week and had carried advertisements in approximately 100 college newspapers throughout the country.

*S.P.S. Consultants* and two other New York cases, *State* v. *Mitchell,* 321 N.Y.S. 2d 756 (1971), and *State* v. *Abortion Information Agency, Inc.,* 323 N.Y.S. 2d 597 (1971), disclose that the for-profit agencies in New York were acting as middlemen for doctors, were soliciting patients for and splitting fees with doctors, and were engaging in the practice of medicine, all in violation of the law. The cases also show that the personnel of the referral agencies lacked medical training and that there was no "follow up procedure" after abortions were performed.

The *Mitchell* case from New York is interesting for another reason. The Martin Mitchell involved in that case apparently was the same Martin Mitchell who was also involved in *Mitchell Family Planning Inc.* v. *City of Royal Oak*, 335 F. Supp. 738 (E.D.Mich. 1972), a case relied upon here by Bigelow. In the Michigan case, the court struck down a city ordinance banning the advertising of "any information concerning the producing or procuring of an abortion," which is unlike the statute in question here. Mitchell had displayed an ad on a billboard merely offering "Abortion Information" and giving two New York telephone numbers, an advertisement quite different from the one published by Bigelow. The court stressed the fact that Mitchell's billboard offered only information, and its opinion indicated that the services to be offered by Mitchell were innocuous. But the New York case shows clearly the true nature of Mitchell's operation.

It is against the evils of such practices as are disclosed by the New York cases that the advertisement restriction in Code § 18.1-63 is designed to protect. This state has a real and direct interest in ensuring that the medical-health field be free of commercial practices and pressures, and we hold that Code § 18.1-63 is a reasonable measure directed to that purpose. *Semler* v. *Dental Examiners, supra,* 294 U.S. at 612-13.

■ This would conclude the question except for a further contention advanced by Bigelow that Code § 18.1-63 is unconstitutional because of overbreadth. Here, he argues that the statute not only encompasses non-protected expression, but in its overbreadth also sweeps within its scope speech which is clearly protected by the First Amendment. He says that the statute is so broad that a doctor who advises a patient that an abortion is appropriate, or a husband who encourages his wife to secure an abortion, or a lecturer who advocates a "right to abortion" would all be guilty of misdemeanors.

The Attorney General argues that Bigelow lacks standing to assert the hypothetical rights of others. Relying on *DeFebio* v. *County School Board*, 199 Va. 511, 514, 100 S.E.2d 760, 762-63 (1957), the Attorney General states that the applicable rule is that one who challenges the constitutionality of a statute must show that he himself has been injured or threatened with injury by its enforcement.

Bigelow insists that he does have standing and relies upon *Owens* v. *Commonwealth*, 211 Va. 633, 179 S.E.2d 477 (1971). There, we held unconstitutional on its face, because overbroad, the definition

of unlawful assembly as contained in Code § 18.1-254.1(c). The Attorney General contended in that case that Owens lacked standing to challenge the constitutionality of the statute. We said, citing *N.A.A.C.P.* v. *Button*, 371 U.S. 415, 432 (1963), that "where First Amendment liberties are involved, persons who engage in non-privileged conduct are not precluded from attacking a statute under which they were convicted." 211 Va. at 638-39, 179 S.E.2d at 481.

While we would not interpret Code § 18.1-63 to encompass the hypothetical situations posed by Bigelow, we need not rest our decision upon that ground. Instead, we hold that *Owens* and *N.A.A.C.P.* v. *Button* are not applicable here. As we have previously demonstrated, Bigelow's activity was of a purely commercial nature. This being so, the rule to be followed is that applied in *Breard* v. *Alexandria*, 341 U.S. 622 (1951). There, a door-to-door salesman of magazines was convicted under an ordinance of the city of Alexandria, Louisiana, which prohibited such a salesman from going in and upon private residences for the purpose of soliciting orders for the sale of goods without prior consent of the owners or occupants. The Supreme Court affirmed. In answer to the contention that the ordinance abridged First Amendment freedom of speech and press, the court stated: "Only the press or oral advocates of ideas could urge this point. It [is] not open to the solicitors for gadgets or brushes." 341 U.S. at 641.

Thus, where, as here, a line can be drawn between commercial and non-commercial conduct and it clearly appears that the prohibited activity is in the commercial area, the actor does not have standing to rely upon the hypothetical rights of those in the non-commercial zone in mounting an attack upon the constitutionality of a legislative enactment. So we deny Bigelow standing to assert the rights of doctors, husbands, and lecturers.

For the reasons assigned, the judgment of the trial court will be affirmed.

*Affirmed.*


I'ANSON and COCHRAN, JJ., dissenting.

We dissent. We conclude that § 18.1-63 is unconstitutionally vague and overbroad. In our view it is unnecessary to decide whether the advertisement is "commercial" in a constitutional sense. *See New*

*York Times* v. *Sullivan*, 376 U.S. 254 (1964). In any event Bigelow has standing to challenge as overbroad the criminal statute under which he was convicted. *Owens* v. *Commonwealth*, 211 Va. 633, 179 S.E.2d 477 (1971). The language of the statute does not purport to regulate commercial advertising only but sweeps within its scope any person who "encourage[s] or prompt[s] the procuring of an abortion" by "publication, lecture, advertisement . . . or in any other manner." For this reason *Breard* v. *Alexandria*, 341 U.S. 622 (1951), a decision which upheld the validity of an ordinance which regulated the *conduct* of door-to-door solicitors rather than their freedom of speech, is inapposite here. Section 18.1-63 seeks to limit freedom of speech in a vague and impermissibly broad manner. Moreover, no distinction is made between legal and illegal abortions (an oversight recently remedied by amendment).

We would reverse the conviction.