OPINION BY Justice G. STEVEN AGEE.
 

 Jeremy Jaynes appeals from the judgment of the Court of Appeals which affirmed his convictions in the Circuit Court of Loudoun County for violations of Code § 18.2.452.3:1, the unsolicited bulk electronic mail (e-mail) provision of the Virginia Computer Crimes Act, Code §§ 18.2-152.1 through-152.15. For the reasons set forth below, we will affirm the judgment of the Court of Appeals.
 

 I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW
 

 From his home in Raleigh, North Carolina, Jaynes used several computers, routers and servers to send over 10,000 e-mails within a 24-hour period to subscribers of America Online, Inc. (AOL) on each of three separate occasions. On July 16, 2003, Jaynes sent 12,197 pieces of unsolicited e-mail with falsified routing and transmission information onto AOL's proprietary network. On July 19, 2003, he sent 24,172, and on July 26, 2003, he sent 19,104. None of the recipients of the e-mails had requested any communication from Jaynes. He intentionally falsified the header information and sender domain names before transmitting the e-mails to the recipients, causing the Internet Protocol (IP) addresses to convey false information to every recipient about Jaynes' identity as the sender.
 
 [1]
 
 However, investigators used a sophisticated database search to identify Jaynes as the sender of the e-mails.
 
 [2]
 
 Jaynes was arrested and charged with violating Code § 18.2-152.3:1, which provides in relevant part:
 

 A. Any person who:
 

 1. Uses a computer or computer network with the intent to falsify or forge electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk electronic mail through or into the computer network of an electronic mail service provider or its subscribers . . . is guilty of a Class 1 misdemeanor.
 

 B. A person is guilty of a Class 6 felony if he commits a violation of subsection A and:
 

 1. The volume of UBE transmitted exceeded 10,000 attempted recipients in any 24-hour period, 100,000 attempted recipients in any 30-day time period, or one million attempted recipients in any one-year time period. . . .
 

 Jaynes moved to dismiss the charges against him on the grounds that the statute violated the dormant. Commerce Clause, was unconstitutionally vague, and violated the First Amendment. The circuit court denied that motion.
 

 During trial, evidence demonstrated that Jaynes knew that all of the more than 50,000 recipients of his unsolicited e-mails were subscribers to AOL, in part, because the e-mail addresses of all recipients ended in "@aol. com" and came from discs stolen from AOL.
 

 Jaynes' e-mails advertised one of three products: (1) a FedEx refund claims product, (2) a "Penny Stock Picker," and (3) a "History Eraser" product.
 
 [3]
 
 To purchase one of these products, potential buyers would click on a hyperlink within the e-mail, which redirected them outside the e-mail, where they could consummate the purchase. Jaynes operated his enterprise through several companies which were not registered to do business in North Carolina, and evidence was introduced as to billing and payment activities for these companies, including evidence that registration fees were paid to AOL with credit cards held by fictitious account holders.
 
 [4]
 

 While executing a search of Jaynes' home, police discovered a cache of compact discs (CDs) containing over 176 million full e-mail addresses and 1.3 billion e-mail user names. The search also led to the confiscation of a storage disc which contained AOL e-mail address information and other personal and private account information for millions of AOL subscribers. Police also discovered multiple storage discs which contained 107 million AOL e-mail addresses. Richard Rubenstein, manager of technical security investigations at AOL, testified that the discs recovered at Jaynes' home "contained proprietary information" of "pretty near all" AOL account customers.
 
 [5]
 
 The AOL user information had been stolen from AOL by a former employee and was in Jaynes' possession.
 

 Dr. John Levine, a consultant and author, testified as an expert witness and explained that the e-mails sent by Jaynes were not consistent with solicited bulk e-mail, but rather constituted unsolicited bulk e-mail (sometimes referred to as "spam" e-mail) because Jaynes had disguised the true sender and header information and used multiple addresses to send the e-mails. He explained:
 

 [H]ere the [e-mail] has been spread around nearly a thousand addresses. Where it's reasonable that you might use maybe a dozen addresses if you have a really big system and you're sending it from a dozen computers, I can't think of a valid reason why you would need to spread your e-mail over a thousand different addresses unless, again, you're trying to disguise the source.
 

 The fact - both the fact that the domains do not seem plausible, they don't seem familiar, and the fact that it's spread out in a way that seems intended to disguise the origin of the mail, is what tells me this is not solicited e-mail.
 

 AOL, which houses all of its e-mail servers in Virginia, was directly affected by Jaynes' spam e-mail attack.
 
 [6]
 
 Brian Sullivan, the senior technical director for mail operations at, AOL, testified that bulk e-mail "tends to create a lot of confusion" for AOL customers and that AOL receives "7 to 10 million complaints per day" regarding spam e-mails. Sullivan also described the impact of spam emails, explaining that "[i]f someone's mailbox is full because they got a truckload of spam and there's no more room, a message coming from Grandma is returned back to the sender. We can't take it at that point,"
 

 A jury convicted Jaynes of three counts of violating Code § 18.2-152.3:1, and the circuit court sentenced Jaynes to three years in prison on each count, with the sentences to run consecutively for an active term of imprisonment of nine years. The Court of Appeals affirmed his convictions,
 
 Jaynes v.
 

 Commonwealth,
 

 48 Va.App. 673
 
 ,
 
 634 S.E.2d 357
 
 (2006). We awarded Jaynes an appeal.
 

 IL ANALYSIS
 

 Jaynes makes four distinct assignments of error to the judgment of the Court of Appeals. First, he assigns error to the determination that the circuit court had jurisdiction over him on the crimes charged. Second, Jaynes contends Code § 18.2-152.3:1 "abridgers] the First Amendment right to anonymous speech," and it was error not to reverse his convictions on that basis. Separately, Jaynes assigns as error the failure of the Court of Appeals to hold that Code § 18.2-152.3:1 is void for vagueness. Lastly, Jaynes' posits that the statute violates the Commerce Clause of the United States Constitution.
 

 A. Jurisdiction
 

 Jaynes asserts that the Court of Appeals erred in holding that the circuit court had jurisdiction over him for violating Code § 18.2-152.3:1 because he did not "use" a computer in Virginia. He contends that a violation of that statute can occur only in the location where the e-mail routing information is falsified. Jaynes maintains that because he only used computers to send the e-mails from his home in Raleigh, North Carolina, he committed no crime in Virginia. Further, because he had no control over the routing of the e-mails, he argues his actions did not have an "immediate result" in Virginia, and under
 
 Moreno v. Baskerville,
 

 249 Va. 16
 
 ,
 
 452 S.E.2d 653
 
 (1995), could not be the basis for jurisdiction over him by Virginia courts. Therefore, according to Jaynes, the circuit court had no jurisdiction over him and his convictions are void.
 

 To successfully prosecute a crime under Code § 18.2-152.3:1(B), the Commonwealth must establish all the elements of that crime. In addition to the element of transmission volume within a specific time period, the Commonwealth must prove the sender used a computer and that such use was with the intent of falsifying routing information. The Commonwealth must also prove that the transmission of such false routing information occurred in connection with the use of an e-mail provider's computer network for that transmission. Thus, the crime is not complete until there is e-mail transmission passing through or into the computer, network of the e-mail provider or subscriber containing the false routing information.
 

 Jaynes argues that he "merely sent emails that happened to be routed through AOL servers." We disagree. As the evidence established, all e-mail must flow through the recipient's e-mail server in order to reach the intended recipient. By selecting AOL subscribers as his e-mail recipients, Jaynes knew and intended that his e-mails would utilize AOL servers because he clearly intended to send to users whose e-mails ended in "@aol.com." The evidence established that the AOL servers are located in Virginia, and that the location of AOL's servers was information easily accessible to the general public. Applying our standard of review to the evidence presented along with all reasonable inferences therefrom, we conclude that the evidence supports the conclusion that Jaynes knew and intended that the e-mails he sent to AOL subscribers would utilize AOL's servers which are located in Virginia. Thus an intended and necessary result of Jaynes' action, the e-mail transmission through the computer network, occurred in Virginia.
 

 Furthermore, a state may exercise jurisdiction over criminal acts that are committed outside the state, but are intended to, and do in fact, produce harm within the state. "`It has long been a commonplace of criminal liability that a person may be charged in the place where the evil results, though he is beyond the jurisdiction when he starts the train of events of which the evil is the fruit.'"
 
 Travelers Health Ass'n v. Commonwealth,
 

 188 Va. 877
 
 , 892,
 
 51 S.E.2d 263
 
 , 269 (1949) (citing
 
 Strassheim v. Daily,
 

 221 U.S. 280
 
 , 284-85,
 
 31 S.Ct. 558
 
 ,
 
 55 L.Ed. 735
 
 (1911)).
 

 Jaynes, relying on
 
 Moreno,
 
 argues that this principle, referred to as the "immediate result doctrine," is not applicable if third parties intervene between the out-of-state conduct and the in-state harm. In.
 
 Moreno,
 
 the defendant, while in Arizona, arranged for delivery of drugs to an accomplice in Arizona who, in turn, delivered the drugs to two
 other accomplices who ultimately sold the drugs in Virginia.
 
 249 Va. at 17-48
 
 ,
 
 452 S.E.2d, at 654
 
 . Noting that drug distribution is not a continuing offense and that payment is not an element of the crime of drug distribution,
 
 id.
 
 at 18-20,
 
 452 S.E.2d at 654-55
 
 , we concluded that the discrete crime of drug distribution was committed by the defendant while in Arizona and that the ultimate sale of the drugs in Virginia was not the "immediate result" of the distribution of drugs in Arizona because the subsequent distributions by Moreno's accomplices intervened.
 
 Id.
 
 at 19,
 
 452 S.E.2d at 655
 
 .
 

 Jaynes argues that an e-mail could be routed through a number of different mail handling networks before the e-mail reaches its destination, and that an e-mail sender cannot control the route used. Such routing, Jaynes contends, is the same type of intervention which occurred in
 
 Moreno.
 
 Therefore, according to Jaynes, the intervention of intermediate e-mail routers and servers prior to arrival of the e-mails at the AOL servers shows that the alleged harm through the AOL, servers in Virginia was not the "immediate result" of Jaynes' actions in North Carolina.
 

 Jaynes' reliance on
 
 Moreno
 
 fails because, as noted above, Jaynes' affirmative act of selecting AOL subscribers as recipients of his e-mails insured the use of AOL's computer network to deliver the e-mails and such use was the "immediate result" of Jaynes' action, regardless of any intermediate routes taken by the e-mails. Because the use of the computer network of an e-mail service provider or its subscribers is an integral part of the crime charged and because the use of AOL's e-mail servers was the "immediate result" of Jaynes' acts, we hold that Jaynes was amenable to prosecution in Virginia for a violation of Code § 18.2,152.1:3. Accordingly, the circuit court had jurisdiction over Jaynes.
 

 B. First Amendment Standing
 

 Jaynes next contends that Code § 18.2-152.3:1 is constitutionally deficient as over-broad under the First Amendment and therefore the statute cannot be enforced. He argues the Court of Appeals erred in affirming the circuit court's judgment which did not grant his motion to dismiss. Jaynes contends that under First Amendment jurisprudence, he has standing to raise the First Amendment claims of third parties and use those claims to defend his unrelated case. The Commonwealth initially responds that Jaynes lacks standing to raise a First Amendment challenge to the statute and therefore the First Amendment issues raised by Jaynes should not be addressed. The opinion of the Court of Appeals did not address the issue of standing as it decided the First Amendment claim on the merits. Because we hold the standing issue is dispositive, we do not address the analysis of the Court of Appeals.
 

 Jaynes does not contest that he transmitted the tens of thousands of e-mails containing false and misleading sender information in contravention of Code § 18.2-152.3:1. He does not deny that act occurred, in fact, on several occasions, each of which was in direct violation of Code § 18.2-152.3:1(B).
 
 [7]
 
 Further, Jaynes does not contest that the bulk e-mails were an attempt by him to sell commercial products for his pecuniary gain and constitute, in this case, unprotected commercial speech for First Amendment purposes. In other words, he does not dispute the emails have no First Amendment protection in their own right, and that the statute is not unconstitutional as applied to him.
 

 Neither does Jaynes make a pure facial challenge to the statute alleging "that no set of circumstances exists under which the Act would be valid."
 
 United States v. Salerno,
 

 481 U.S. 739
 
 , 745,
 
 107 S.Ct. 2095
 
 ,
 
 95 L.Ed.2d 697
 
 (1987). Instead, in First Amendment parlance, Jaynes challenges the statute by claiming unconstitutional over-breadth.
 
 See Virginia v. Hicks,
 

 539 U.S. 113
 
 , 118-19,
 
 123 S.Ct. 2191
 
 ,
 
 156 L.Ed.2d 148
 
 (2003).
 
 [8]
 
 That is, Jaynes contends that because
 the statute could potentially reach the protected speech of a third party, a hypothetical person neither charged with a crime nor before this Court, he (Jaynes) is entitled to claim exoneration for his unprotected commercial speech because Code § 18.2-152.3:1 could encompass an unknown individual's potentially protected speech. This concept of the invalidity of a criminal statute as overbroad under the First Amendment is Jaynes' basis to assert he has standing to contest an otherwise valid conviction for admitted criminal conduct.
 

 If Jaynes' claim of overbreadth invalidity were brought under nearly any other constitutional basis than the First Amendment, it is clear he would have no standing to assert the claims of others.
 
 See Members of City Council v. Taxpayers for Vincent,
 

 466 U.S. 789
 
 , 796,
 
 104 S.Ct. 2118
 
 ,
 
 80 L.Ed.2d 772
 
 (1984) ("the general rule [is] that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court");
 
 United States v. Raines,
 

 362 U.S. 17
 
 , 21,
 
 80 S.Ct. 519
 
 ,
 
 4 L.Ed.2d 524
 
 (1960) ("one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional"). However, the United States Supreme Court has recognized an exception to the ordinary rules of standing when constitutional claims involve the First Amendment.
 

 For example, in
 
 Broadrick v. Oklahoma,
 

 413 U.S. 601
 
 ,
 
 93 S.Ct. 2908
 
 ,
 
 37 L.Ed.2d 830
 
 (1973), the Court noted the permissive standard for First Amendment standing:
 

 As a corollary, the Court has altered its traditional rules of standing to permit - in the First Amendment area - "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."
 
 Dombrowski v. Pfister,
 
 [
 
 380 U.S. 479
 
 , 486,
 
 85 S.Ct. 1116
 
 ,
 
 14 L.Ed.2d 22
 
 (1965) ]. Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.
 

 413 U.S. at 612
 
 ,
 
 93 S.Ct. 2908
 
 ;
 
 See New York v. Ferber,
 

 458 U.S. 747
 
 , 768-69,
 
 102 S.Ct. 3348
 
 ,
 
 73 L.Ed.2d 1113
 
 (1982) (citations omitted) ("The traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court. . . . What has come to be known as the First Amendment overbreadth doctrine is one of the few exceptions to this principle and must be justified by `weighty countervailing policies'. . . . The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted").
 

 While cases such as
 
 Broadrick
 
 reflect broader standing for First Amendment overbreadth challenges, the decision of the United States Supreme Court in
 
 Hicks
 
 made clear that those rules of standing apply in federal courts where federal jurisdiction is at issue. The Supreme Court in
 
 Hicks
 
 leaves to the states an independent decision on overbreadth standing in a First Amendment context where the claim is made in a state court regarding a state statute.
 

 1.
 
 Virginia v. Hicks
 

 In
 
 Hicks,
 
 the United States Supreme Court confirmed that the several states have the constitutional authority to determine independently whether to allow a First Amendment overbreadth challenge to a state statute.
 

 [O]ur standing rules limit only the
 
 federal
 
 courts' jurisdiction over certain claims. State courts are not bound by the limitations of a case or controversy or other federal rules of justiciability even when they address issues of federal law. Whether Virginia's courts . . . entertain
 [an] overbreadth challenge is entirely a matter of state law.
 

 Hicks,
 

 539 U.S. at 120
 
 ,
 
 123 S.Ct. 2191
 
 (citation omitted).
 

 The Supreme Court in
 
 Hicks
 
 `makes clear that the
 
 Broadrick
 
 standing concept applies only in the federal courts because: "our standing rules limit only the
 
 federal
 
 courts' jurisdiction over certain claims."
 
 539 U.S. at 120
 
 ,
 
 123 S.Ct. 2191
 
 . While there is federal precedent to support Jaynes' claim of standing if his case were in a federal court on the issue of federal jurisdiction, it is noteworthy that the Supreme Court declined to opine on that issue in
 
 Hicks:
 

 We accordingly proceed to [the] merits inquiry, leaving for another day the question whether our ordinary rule that a litigant may not rest a claim to relief on the legal rights or interests of third parties,
 
 see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,
 

 454 U.S. 464
 
 , 474,
 
 102 S.Ct. 752
 
 ,
 
 70 L.Ed.2d 700
 
 (1982), would exclude a case such as this from' initiation in federal court.
 

 After
 
 Hicks,
 
 there is no doubt that Virginia can establish the standing requirement for a litigant, like Jaynes, who brings a First Amendment overbreadth challenge.
 
 539 U.S. at 120
 
 ,
 
 123 S.Ct. 2191
 
 . The issue then becomes what, if any, First Amendment standing requirement has been adopted in Virginia?
 

 2. Virginia Standing
 

 Citing
 
 Stanley v. City of Norfolk,
 

 218 Va. 504
 
 ,
 
 237 S.E.2d 799
 
 (1977), Jaynes argues there is an established First Amendment overbreadth standing requirement and relies on the following statement we made in
 
 Stanley:
 

 [I]t appears that, for purposes of standing to make facial attacks, the Supreme Court makes a distinction between two separate concepts of overbreadth,
 
 viz.,
 
 (a)
 
 due process overbreadth,
 
 resulting from statutory language so vague that it could be selectively construed and enforced by police, prosecutors, and triers-of-fact to penalize persons pot before the court, for conduct not before the court, without fair warning of the criminality of their conduct, and (b)
 
 First Amendment overbreadth
 
 resulting either from statutory language so vague it could "chill" the exercise of constitutionally protected speech or conduct, or from precise statutory language which expressly seeks to regulate protected speech,
 
 Gooding v. Wilson,
 

 405 U.S. 518
 
 , 520-22,
 
 92 S.Ct. 1103
 
 ,
 
 31 L.Ed.2d 408
 
 (1972), or to regulate the time, place, and manner of communicative conduct,
 
 see e.g., Grayned v. City of Rockford,
 

 408 U.S. 104
 
 , 115-21,
 
 92 S.Ct. 2294
 
 ,
 
 33 L.Ed.2d 222
 
 (1972), or to require prior approval of communicative conduct by officials vested with standardless discretionary power,
 
 see e.g., Shuttlesworth v. Birmingham,
 

 394 U.S. 147
 
 ,
 
 89 S.Ct. 935
 
 ,
 
 22 L.Ed.2d 162
 
 (1969); or from statutory language which might be so applied as to burden innocent associations,
 
 see e.g., Keyishian v. Board of Regents,
 

 385 U.S. 589
 
 ,
 
 87 S.Ct. 675
 
 ,
 
 17 L.Ed.2d 629
 
 (1967). It seems clear that, when overbreadth impinges upon First Amendment guarantees, a person accused under the statute has standing to make a facial attack, even though his own speech or conduct was not constitutionally protected; when overbreadth has only due process implications, he has no standing to make a facial attack but only standing to challenge the statute as applied to his own conduct.
 

 218 Va. at 508
 
 ,
 
 237 S.E.2d at 801-02
 
 . However,
 
 Stanley
 
 and other cases Jaynes cites as making similar pronouncements do not have the precedential status he envisions, particularly as they relate to otherwise unprotected commercial speech.
 
 [9]
 

 A review of case law on First Amendment standing before and after
 
 Stanley
 
 is particularly instructive. We begin with our decision in
 
 Bigelow v. Commonwealth,
 

 213 Va. 191
 
 ,
 
 191 S.E.2d 173
 
 (1972), in which the defendant, Bigelow, was convicted of "encouraging . . . the procuring of abortion by publication" when advertisements for abortion services ran in the weekly newspaper he managed.
 
 213 Va., at 191-92
 
 ,
 
 191 S.E.2d at 174
 
 . On appeal, we determined Bigelow had no standing to assert a First Amendment overbreadth challenge to the operation of the statute at issue because his "activity was of a purely commercial nature."
 

 Id.
 

 at 198
 
 ,
 
 191 S.E.2d at 177
 
 . We distinguished our opinion in
 
 Owens
 
 because that case involved unlawful assembly and breach of the peace, not a commercial activity.
 

 Id.
 

 Upon appeal to the United States Supreme Court, the case was remanded "for further consideration in light of
 
 Roe v. Wade,
 

 410 U.S. 113
 
 ,
 
 93 S.Ct. 705
 
 ,
 
 35 L.Ed.2d 147
 
 (1973); and
 
 Doe v. Bolton,
 

 410 U.S. 179
 
 ,
 
 93 S.Ct. 739
 
 ,
 
 35 L.Ed.2d 201
 
 (1973)."
 
 Bigelow v. Virginia,
 

 413 U.S. 909
 
 ,
 
 93 S.Ct. 3057
 
 ,
 
 37 L.Ed.2d 1020
 
 (1973). Upon remand, we again affirmed Bigelow's conviction.
 
 Bigelow v. Commonwealth,
 

 214 Va. 341
 
 , 342,
 
 200 S.E.2d 680
 
 (1973). The United States Supreme Court, on the second appeal, reversed our judgment.
 
 Bigelow v. Virginia,
 

 421 U.S. 809
 
 ,
 
 95 S.Ct. 2222
 
 ,
 
 44 L.Ed.2d 600
 
 (1975). The Supreme Court opined that this Court "erred in denying Bigelow standing to make this claim without any consideration of whether the alleged overbreadth was or was not substantial,"
 

 id.
 

 at 817
 
 ,
 
 95 S.Ct. 2222
 
 , but "decline[d] to rest [the] decision on overbreadth and pass[ed] on to the further inquiry . . . whether the statute as applied . . . infringed constitutionally protected speech."
 

 Id.
 

 at 818
 
 ,
 
 95 S.Ct. 2222
 
 . Ultimately, the Supreme Court held the statute as applied to Bigelow violated his First Amendment rights.
 

 Id.
 

 at 829
 
 ,
 
 95 S.Ct. 2222
 
 .
 

 During the pendency of the second Bigelow appeal in the United States Supreme Court, we decided the case of
 
 Wayside Restaurant, Inc. v. City of Virginia Beach,
 

 215 Va. 231
 
 ,
 
 208 S.E.2d 51
 
 (1974). In
 
 Wayside Restaurant,
 
 operators of topless bars challenged an ordinance of the City of Virginia Beach in a declaratory judgment action.
 
 215 Va. at 232
 
 ,
 
 208 S.E.2d at 52-53
 
 . The ordinance,
 
 inter alia,
 
 had been interpreted by the police to prohibit "`topless' female dancers as entertainment" at the operators' bars.
 
 Id.
 
 at 232-33,
 
 208 S.E.2d at 53
 
 . In the declaratory judgment action, the operators claimed "the ordinance is overbroad and violates the First Amendment guarantees of free speech and assembly."
 
 Id.
 
 at 233,
 
 208 S.E.2d at 53
 
 . The circuit court rejected that claim.
 

 On appeal, this Court noted "the crucial fact that the appellants are admittedly engaged in . . . a commercial enterprise" and then rejected the operators' First Amendment overbreadth claim for lack of standing.
 
 Id.
 
 at 234-35,
 
 208 S.E.2d at 54
 
 .
 

 The appellants advance a number of arguments that the ordinance is overbroad, i.e., that it would proscribe the wearing of many types of socially acceptable wearing apparel and beach wear, and that dancing, as a form of expression, is speech protected by the First Amendment. The rule is that where, as here, a line can be clearly drawn between commercial and noncommercial conduct and it clearly appears that the prohibited activity is in the commercial area, the actor does not have standing to rely upon the hypothetical rights of those in the non-commercial zone in mounting an attack upon the constitutionality of a legislative enactment. [T]he appellants have no standing to assert the rights of those engaged in noncommercial activity. . . .
 

 Id.
 

 (citation omitted).
 

 Although later decisions cited by Jaynes -
 
 Stanley, Esper Bonding Co. v. Commonwealth,
 

 222 Va. 595
 
 ,
 
 283 S.E.2d 185
 
 (1981), and
 
 Gray v. Commonwealth,
 

 260 Va. 675
 
 ,
 
 537 S.E.2d 862
 
 (2000) - all accorded standing to a defendant to "make a facial challenge invoking the First Amendment rights of third parties,"
 
 Esper Bonding Co.,
 
 222, Va. at 597,
 
 283 S.E.2d at 186
 
 , all of those cases involve noncommercial conduct by the defendants. Stanley concerned a charge of disorderly
 conduct during an assault and raised a due process overbreadth challenge and not a First Amendment claim.
 
 218 Va. at 505-06
 
 ,
 
 237 S.E.2d at 800
 
 .
 
 Esper Bonding Co.
 
 involved the
 
 Commonwealth's
 
 attempt to assert third party rights regarding the forfeiture of a bail bond, which we denied.
 
 222 Va. at 597-98
 
 ,
 
 283 S.E.2d at 186
 
 .
 
 Gray
 
 involved a challenge on vagueness grounds to a statute prohibiting possession of an unregistered silenced firearm.
 
 260 Va. at 680-81
 
 ,
 
 537 S.E.2d at 865
 
 . The distinction between commercial and noncommercial speech set forth in
 
 Wayside Restaurant
 
 was never at issue. More importantly,
 
 Wayside Restaurant
 
 has never been overruled.
 

 Even if the dicta in the Supreme Court's second
 
 Bigelow
 
 decision on First Amendment overbreadth standing was deemed to contradict the conclusion in
 
 Wayside Restaurant,
 
 that dicta has no force after the clear pronouncement in
 
 Hicks.
 
 The authority of the several states to make their own standing rules regarding an overbreadth challenge is unmistakable under
 
 Hicks:
 
 "our standing rules limit only the
 
 federal
 
 courts' jurisdiction. . . . Whether Virginia's courts . . .
 
 entertain
 
 [an] overbreadth challenge is entirely a matter of state law."
 
 Hicks,
 

 539 U.S. at 120
 
 ,
 
 123 S.Ct. 2191
 
 (citation omitted). Thus, the force, if any, of the earlier Supreme Court decision in
 
 Bigelow
 
 on the issue of Virginia standing is clearly and unequivocally negated by
 
 Hicks.
 

 As noted earlier, neither
 
 Stanley
 
 nor the other First Amendment standing cases cited by Jaynes addressed the standing distinction set forth in
 
 Wayside Restaurant.
 

 [10]
 
 Thus, it would appear that Virginia does not accord standing to a person, such as Jaynes, whose actions involve only otherwise unprotected commercial speech, to assert the First Amendment rights of those who engage in noncommercial speech. However, to resolve the case at bar, it is unnecessary to resolve the extent of any precedential value of Wayside
 
 Restaurant.
 

 In
 
 Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,
 

 425 U.S. 748
 
 ,
 
 96 S.Ct. 1817
 
 ,
 
 48 L.Ed.2d 346
 
 (1976), the United States Supreme Court recognized that certain commercial speech, even that "which does no more than propose a commercial transaction," can be entitled First Amendment protection.
 
 425 U.S. at 776
 
 ,
 
 96 S.Ct. 1817
 
 (Stewart, J., concurring). In later cases, the Supreme Court "recognized the "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation,'"
 
 Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,
 

 447 U.S. 557
 
 , 562,
 
 100 S.Ct. 2343
 
 ,
 
 65 L.Ed.2d 341
 
 (1980) (quoting
 
 Ohralik v. Ohio State Bar Assn.,
 

 436 U.S. 447
 
 , 455-56,
 
 98 S.Ct. 1912
 
 ,
 
 56 L.Ed.2d 444
 
 (1978)). "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."
 
 Central Hudson Gas,
 

 447 U.S. at 562-63
 
 ,
 
 100 S.Ct. 2343
 
 .
 

 In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
 

 Id.
 

 at 566
 
 ,
 
 100 S.Ct. 2343
 
 .
 

 In
 
 Board of Trustees v. Fox,
 

 492 U.S. 469
 
 ,
 
 109 S.Ct. 3028
 
 , 106 "L.Ed.2d 388 (1989), the Supreme Court re-emphasized the holding in
 
 Central Hudson
 
 that the initial portal through which one claiming First Amendment protection for commercial speech must pass is that such speech "not be misleading."
 
 492 U.S. at 475
 
 ,
 
 109 S.Ct. 3028
 
 (quoting
 
 Central Hudson Gas,
 

 447 U.S. at 566
 
 ,
 
 100 S.Ct. 2343
 
 ). Commercial speech which fails this initial test does not receive First Amendment protection.
 
 Id
 
 As the Court further
 noted in
 
 Fox,
 
 this result is, in part, due to the realization that "overbreadth analysis does not normally apply to commercial speech, [and] a statute whose overbreadth consists of unlawful restriction of commercial speech will not be facially invalidated on that ground - our reasoning being that commercial speech is more hardy, less likely to be `chilled,' and not in need of surrogate litigators".
 
 Id.
 
 at 481,
 
 109 S.Ct. 3028
 
 . While
 
 Central Hudson Gas
 
 and
 
 Fox
 
 did address First Amendment claims on the merits, the condition precedent recognized in each case as to whether a person's commercial speech can be accorded First Amendment protection, that the commercial speech not be misleading, seems equally applicable in an analysis of standing.
 

 There is no question in this case that Jaynes' e-mails "propose a commercial transaction,"
 

 Id.
 

 at 482
 
 ,
 
 109 S.Ct. 3028
 
 , and are thus some form of commercial speech. As noted earlier, Jaynes makes no claim that his' commercial speech, on its `own merits, is entitled to any First Amendment protection. Just as clearly, it is self-evident that Jaynes' e-mails are misleading because each contained intentionally false and inaccurate routing and header information intended to shield Jaynes from accountability for his sales schemes. Jaynes does not contest the e-mail routing and header information was false. Thus, Jaynes' commercial speech would fail the initial requirement for First Amendment review under
 
 Central Hudson Gas
 
 and
 
 Fox
 
 because it is "misleading" on its face. In that circumstance, it is reasonable not to accord the speaker of such misleading commercial speech, admittedly unprotected in its own right, standing to vicariously raise the First Amendment claims of others.
 

 We therefore hold that Jaynes has no standing to raise a First Amendment objection to Code § 18.2-152.3:1. No Virginia standing should be accorded a person to assert an overbreadth challenge when that person's conduct consists of misleading commercial speech that is entitled to no First Amendment protection on its own merits.
 
 [11]
 
 If we were to rule otherwise, a criminal defendant whose misleading commercial activities are clearly a crime and otherwise unprotected by the First Amendment gets an unrestricted invitation to apply for a "Get Out of Jail Free" card by merely pleading a hypothetical First Amendment infringement upon a hypothetical person not charged with a crime. This fails the test of common sense, but also seems unlikely to be a practical bulwark of defending First Amendment rights as decisions like
 
 Central Hudson Gas
 
 and
 
 Fox
 
 recognize.
 
 [12]
 

 Jaynes thus has no standing to challenge the statute in question unless he could show there is no set of circumstances in which Code § 18.2-152.3:1 can be constitutionally applied.
 
 Salerno,
 

 481 U.S. at 745
 
 ,
 
 107 S.Ct. 2095
 
 ;
 
 see Parker v. Levy,
 

 417 U.S. 733
 
 , 760,
 
 94 S.Ct. 2547
 
 ,
 
 41 L.Ed.2d 439
 
 (1974) ("This Court has, however, repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the `remainder of the statute . . . covers a whole range of easily identifiable and constitutionally proscribable . . . conduct'") (citations omitted);
 
 see also Davenport v. Washington Educ. Ass'n,
 
 551 U.S. ___, ___ n. 5,
 
 127 S.Ct. 2372
 
 , 2382 n. 5,
 
 168 L.Ed.2d 71
 
 (2007). As noted earlier, Jaynes does not make a pure facial challenge to the statute, and we therefore do not consider an argument on that basis. Rule 5:17;
 

 Rule 5:25. Moreover, it is self evident Jaynes could not establish that there is no set of circumstances which exist under which the statute would be valid; it is obviously applicable to him. Jaynes therefore lacks standing to raise the First Amendment claim.
 

 C. Vagueness
 

 Jaynes also contends that Code § 18.2-152.3:1 is unconstitutionally void for vagueness and that the Court of Appeals erred in not reversing the judgment of the circuit court on that basis. He argues that the as-applied standard for vagueness used by the Court of Appeals was improper because his challenge was to the facial validity of the statute. The Commonwealth responds that Jaynes does not have standing to bring a vagueness challenge to the statute because the statute clearly applied to him. We agree with the Commonwealth.
 

 The United States Supreme Court, in
 
 Hoffman Estates v. Flipside, Hoffman Estates, Inc.,
 

 455 U.S. 489
 
 ,
 
 102 S.Ct. 1186
 
 ,
 
 71 L.Ed.2d 362
 
 (1982) explained the standard for a vagueness challenge:
 

 In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A
 
 plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.
 
 A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law."
 

 Id.
 

 at 494-95
 
 ,
 
 102 S.Ct. 1186
 
 (emphasis added). Additionally, the United States Supreme Court stated in
 
 Parker v. Levy,
 

 417 U.S. 733
 
 , 756,
 
 94 S.Ct. 2547
 
 ,
 
 41 L.Ed.2d 439
 
 (1974), that: "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." This Court; citing
 
 Hoffman Estates
 
 and
 
 Parker,
 
 restated this principle in
 
 Commonwealth v. Hicks,
 

 267 Va. 573
 
 ,
 
 596 S.E.2d 74
 
 (2004),
 
 [13]
 
 "[i]t is clear that [one] who engaged in conduct prohibited [by the statute] may not complain that the [statute] is purportedly vague."
 
 Id.
 
 at 581,
 
 596 S.E.2d at 78
 
 .
 

 As the United States Supreme Court in
 
 Parker
 
 and
 
 Hoffman Estates,
 
 as well as this Court in
 
 Hicks II,
 
 has made consistently clear, one does not have standing to make a facial challenge to a statute on the basis of unconstitutional vagueness if the statute plainly applies to that person on the facts of the case. As the Supreme Court further stated in
 
 Parker,
 
 "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."
 
 417 U.S. at 757
 
 ,
 
 94 S.Ct. 2547
 
 (citation omitted). Jaynes cannot make this claim.
 

 Jaynes was convicted under the felony provisions of Code § 18.2-152.3:1(B), which clearly sets out what constitutes unsolicited bulk e-mail.
 
 [14]
 
 Jaynes could not reasonably be unaware from the language of the statute that his multiple transmissions of more than 10,000 e-mails within the proscribed period violated subsection (B). His claim that he would not understand what constituted "unsolicited bulk electronic mail" is without merit in the clear context of subsection (B) of the statute.
 

 The bulk e-mails were plainly unsolicited given the evidence at trial that Jaynes had received a list of stolen e-mail addresses of AOL customers and there was no evidence any recipient requested or consented to the
 e-mails. In the context of this record, Jaynes' claim of vagueness for the term "unsolicited" is devoid of merit. Evidence at trial indicated no basis upon which Jaynes could claim vagueness as to the meaning of "falsify" or "electronic mail transmission information." Thus, the statute undoubtedly applies to Jaynes' conduct, and therefore, he has no standing to challenge the statute for vagueness.
 
 [15]
 

 Hicks II,
 

 267 Va. at 580-81
 
 ,
 
 596 S.E.2d at 78
 
 .
 

 D. Dormant Commerce Clause
 

 Jaynes also contends that the Court of Appeals erred because it did not hold that Code § 18.2-152.3:1 violates the Commerce Clause, Art. 1, Section 8 of the United States Constitution. The Commerce Clause provides that, "[t]he Congress shall have power . . . [t]o regulate commerce . . . among the several states." U.S. Const., art. I, § 8, cl. 3. The Commerce Clause has been said to contain a "dormant" aspect which limits a state's ability to "discriminate [ ] against or unduly burden [ ] interstate commerce and thereby imped[e] free private trade in the national marketplace."
 
 PSINet, Inc. v. Chapman,
 

 362 F.3d 227
 
 , 239 (4th Cir.2004) (citations omitted).
 

 Jaynes sole argument on appeal is that the statute is
 
 "per se
 
 invalid because its practical effect is to regulate wholly extraterritorial e-mail transactions." The Commonwealth acknowledges that a rule of "virtual per se invalidity" applies if a state statute discriminates "either on its face, or in practical effect" against interstate commerce. (Emphasis omitted.)
 

 A state statute may violate the dormant Commerce Clause if it discriminates against interstate commerce, favoring "instate economic interests over out-of-state interests,"
 
 Brown-Forman Distillers Corp. v. New York State Liquor Auth.,
 

 476 U.S. 573
 
 , 579,
 
 106 S.Ct. 2080
 
 ,
 
 90 L.Ed.2d 552
 
 (1986), or if it has the "`practical effect' of regulating commerce occurring wholly outside that State's borders."
 
 Healy v. Beer Institute,
 

 491 U.S. 324
 
 , 332,
 
 109 S.Ct. 2491
 
 ,
 
 105 L.Ed.2d 275
 
 (1989).
 

 When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.
 

 Id.
 

 at 337 n. 14,
 
 109 S.Ct. 2491
 
 (citation omitted).
 

 Jaynes asserts that Code § 18.2-152.3:1 falls within the second category of violation because it affects e-mails that "merely pass through Virginia servers
 
 en route
 
 to their final destinations," thus regulating wholly extraterritorial e-mail transactions.
 

 In rejecting Jaynes' dormant Commerce Clause argument, we first note that his argument contains an inherent contradiction. An e-mail that passes through Virginia cannot be a "wholly extraterritorial" transaction. Nevertheless, the sender of an e-mail cannot insure that the e-mail will not at some point pass through Virginia. This factual reality of e-mail transmission has the potential of burdening interstate commerce because e-mail senders may have a heightened concern of possible criminal prosecution if their e-mails were routed through Virginia without their direction or knowledge.
 

 To determine if this burden invalidates the statute, we apply the balancing test recited in
 
 Pike v. Bruce Church, Inc.,
 

 397 U.S. 137
 
 , 142,
 
 90 S.Ct. 844
 
 ,
 
 25 L.Ed.2d 174
 
 (1970): "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."
 

 In this case, the legitimate local public interest in preventing the proliferation of falsified unsolicited bulk e-mail, or "spam", is well documented. The Federal Government and many states have adopted anti-spam statutes.
 
 See, e.g.,
 
 Arminda B. Bepko,
 
 Note: A State-By-State Comparison of SPAM Laws,
 
 13 Media L. & Pol'y 20 (2004). Congress has recognized that unsolicited e-mail may result in costs to recipients, and impose significant monetary Costs on providers of Internet access services.
 
 15 U.S.C. § 7701
 
 (2004). Furthermore, Congress has specifically allowed the states to regulate spam that "involves "falsity or deception in any portion of a commercial electronic mail message or information attached thereto."
 
 15 U.S.C. § 7707
 
 (b). As noted earlier, Jaynes' e-mails were unquestionably commercial and contained false routing and header information. It is clear that the Commonwealth has a strong local interest in, and gains local benefits from, regulating the type of e-mail proscribed by Code § 18.2-152.3:1.
 

 By contrast, the effects of this statute on interstate commerce are incidental and do not impose an undue burden. Whatever burden there may be is the same for a Virginia or a non-Virginia unsolicited bulk e-mail sender. The only burden placed on the email sender is that the e-mail not contain false or forged transmission information. In the realm of legitimate commercial transactions, true identification of the market participant would seem to be the norm, not the transmission of e-mails with false identification. In comparing the obvious local benefit with the minimal burden on in-state or out-of-state commerce, both the Court of Appeals and the circuit court cited oft-quoted commentators:
 

 Even assuming that the antispam laws do not significantly further the state's interest, it is hard to see how the antispam laws burden interstate commerce at all. The spam laws essentially require truthfulness in the header, return address, and subject line of the e-mail, Far from burdening commerce, the truthfulness requirement facilitates it by eliminating fraud and deception. Compliance with the various antispam statutes is easy compared to noncompliance, which requires the spammer to incur costs of forging, re-mailing, and the like.
 

 Jack L. Goldsmith and Alan O. Sykes,
 
 The Internet and the. Dormant Commerce Clause,
 

 110 Yale L.J. 785
 
 , 819 (2001).
 
 [16]
 

 For these reasons, we conclude that Code § 18.2-152,3:1 does not violate the dormant Commerce Clause.
 

 III. CONCLUSION
 

 In conclusion, we hold that the circuit court had jurisdiction over Jaynes. We also hold that Jaynes does not have standing to make a First Amendment overbreadth challenge to Code § 18.2-152.3:1. Finally, we hold that Jaynes' vagueness argument is without merit, and the statute does not violate the Commerce Clause. We will therefore affirm the judgment of the Court of Appeals upholding these convictions and sentences.
 

 Affirmed.
 

 ---------------
 

 Senior Justice LACY, with whom Justice KOONTZ and Justice LEMONS join, dissenting.
 

 I concur in the majority's conclusions on the issues of jurisdiction, vagueness and the Commerce Clause. However, I cannot join the majority's decision that Jaynes does not have standing to raise a First Amendment claim that Code §' 18.2-152.3:1 is unconstitutionally overbroad. As discussed below, I firmly believe that the policy reflected in other cases of this Court and virtually all other state and federal courts allowing litigants under very limited circumstances to raise constitutional challenges to statutes alleged to unconstitutionally burden the First Amendment right of free speech of third parties is the correct policy. Furthermore,
 by rejecting this exception to the standing rule, the majority sends those litigants who raise an overbreadth challenge to statutes of this Commonwealth to the federal judicial system to construe such Virginia statutes and determine whether they are constitutional. I believe that the courts of this Commonwealth, not the federal courts, have the primary responsibility to consider and construe the statutes of this Commonwealth.
 

 A.
 
 Standing
 

 The majority opinion clearly and correctly recites that, as a general rule, a litigant has standing to sue only to vindicate those rights possessed by the litigant. The reasons for this standing requirement reflect important policy considerations including the principle that courts should not issue advisory opinions on factual situations not before it.
 
 See e.g., Commonwealth v. Harley,
 

 256 Va. 216
 
 , 219-20,
 
 504 S.E.2d 852
 
 , 854 (1998) (courts not constituted to render advisory opinions). The majority also identifies a limited exception to this rule that is made in one isolated but significant area. The exception allows a litigant to challenge a statute as overbroad in violation of rights protected by the First Amendment to the United States Constitution even if the challenger engaged in activity that is not entitled to constitutional protection. The United States Supreme Court has often expressed the reason for allowing this exception:
 

 This "exception to the usual rules governing standing,"
 
 Dombrowski v. Pfister,
 
 380 U.S. [479,] 486 [
 
 85 S.Ct. 1116
 
 (1945) ], reflects the transcendent value to all society of constitutionally protected expression. We give a defendant standing to challenge a statute on grounds that it is facially overbroad, regardless of whether his own conduct could be regulated by a more narrowly drawn statute, because of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application."
 
 NAACP v. Button,
 
 371 U.S. [415,] 433 [
 
 83 S.Ct. 328
 
 ,
 
 9 L.Ed.2d 405
 
 (1963)
 

 Bigelow v. Virginia,
 

 421 U.S. 809
 
 , 816,
 
 95 S.Ct. 2222
 
 ,
 
 44 L.Ed.2d 600
 
 (1975)
 
 ("Bigelow II").
 

 We have provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or "chill" constitutionally protected speech - especially when the overbroad statute imposes criminal sanctions. Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.
 

 Virginia v. Hicks,
 

 539 U.S. 113
 
 , 119,
 
 123 S.Ct. 2191
 
 ,
 
 156 L.Ed.2d 148
 
 (2003) (citations omitted).
 

 This standing exception, however, is not without limits. When this exception is applied, enforcement of the offending statute will be invalidated only in instances in which the statute "punishes a `substantial' amount of protected free speech, `judged in relation to the statute's plainly legitimate sweep.'"
 

 Id.
 

 at 118-19
 
 ,
 
 123 S.Ct. 2191
 
 (quoting
 
 Broadrick v. Oklahoma,
 

 413 U.S. 601
 
 , 615,
 
 93 S.Ct. 2908
 
 ,
 
 37 L.Ed.2d 830
 
 (1973)). "Furthermore, courts are instructed to apply a limiting construction or partial invalidation to the statute if available in order to remove the constitutionally offending application and avoid the invalidating enforcement of the entire statute.
 
 See Virginia v. Hicks,
 

 539 U.S. at 119
 
 ,
 
 123 S.Ct. 2191
 
 (quoting
 
 Broadrick,
 

 413 U.S. at 613
 
 ,
 
 93 S.Ct. 2908
 
 ). These limitations prevent widespread misuse of the exception and provide a realistic balance between the policies underlying general principles of standing and the policies supporting the exception to standing.
 

 In my opinion the rationale for the exception to the normal rule of standing is as valid today as it was when first adopted in 1940.
 
 See Thornhill v. Alabama,
 

 310 U.S. 88
 
 , 96-100,
 
 60 S.Ct. 736
 
 ,
 
 84 L.Ed. 1093
 
 (1940). Indeed, it may be even more relevant in this era of communication through the Internet. The current use of the Internet as the marketplace for expressing political ideas, views and positions emphasizes the need for insuring that use of this medium not be chilled by the threat of criminal prosecution. Those persons wishing to use this medium should
 have the same ability to express their views anonymously as did Thomas Paine during the founding of our country.
 

 The majority's decision is especially problematic when viewed in the context of our cases that have acknowledged that persons engaged in unprotected activity could raise an overbreadth challenge to statutes of this Commonwealth in the courts of this Commonwealth, even if such challenges were not dispositive or successful in the case.
 
 See Esper Bonding Co. v. Commonwealth,
 

 222 Va. 595
 
 ,
 
 283 S.E.2d 185
 
 (1981),
 
 Pedersen v. City of Richmond,
 

 219 Va. 1061
 
 ,
 
 254 S.E.2d 95
 
 (1979),
 
 Stanley v. City of Norfolk,
 

 218 Va. 504
 
 ,
 
 237 S.E.2d 799
 
 (1977),
 
 Owens v. Commonwealth,
 

 211 Va. 633
 
 ,
 
 179 S.E.2d 477
 
 (1971). The majority concludes that these cases have no precedential value because they did not involve litigants engaged in commercial speech, and although the cases acknowledged the existence of the standing exception, the defendants did not prevail on that basis.
 

 In contrast, the majority vests precedential value in the 1974 case of
 
 Wayside Restaurant, Inc. v. City of Virginia Beach,
 

 215 Va. 231
 
 ,
 
 208 S.E.2d 51
 
 (1974), asserting that in that case this Court refused to allow standing to a defendant engaged in commercial conduct (topless dancing in a restaurant) to raise the "hypothetical rights of those in the noncommercial zone in mounting an attack upon the constitutionality of a legislative enactment."
 
 Id.
 
 at 235,
 
 208 S.E.2d at 54
 
 . Observing that no subsequent case of this Court has addressed
 
 Wayside Restaurant,
 
 the majority, without determining the extent of the case's precedential value, concludes that "Virginia does not accord standing to a person, such as Jaynes, whose actions involve only otherwise unprotected commercial speech, to assert the First `Amendment rights of those who engage in noncommercial speech." It is on the basis of this "standing rule" drawing a distinction between unprotected commercial and noncommercial speech, that the majority builds its case for denying Jaynes standing here, Not only do T reject this distinction as a legitimate basis for discriminating in the application of the standing exception,
 
 infra,
 
 the historical context of
 
 Wayside Restaurant
 
 and the opinion itself, in my view, do not create the "standing rule" and "apparent" precedential value found by the majority.
 

 As the majority acknowledges,
 
 Wayside Restaurant
 
 was decided while
 
 Bigelow II,
 
 was pending in the United States Supreme Court. The defendant in that case, a publisher of an advertisement for a doctor who performed abortions, sought to use the exception to the standing rule to assert a First Amendment overbreadth challenge to the statute. When that case was before this Court, the Attorney General argued that the defendant "lacks standing to assert the hypothetical rights of others."
 
 Bigelow v. Commonwealth,
 

 213 Va. 191
 
 , 197,
 
 191 S.E.2d 173
 
 , 177 (1972)
 
 ("Bigelow I").
 
 The defendant and the dissent asserted that the requisite standing existed, relying upon a previous case of the Court in which the Court stated that "where First Amendment liberties are involved, persons who engage in non-privileged conduct are not precluded from attacking a statute under which they were convicted."
 
 Owens,
 

 211 Va. at 638-39
 
 ,
 
 179 S.E.2d at 481
 
 . The United States Supreme Court reversed this Court after
 
 Wayside Restaurant
 
 was decided, noting that this Court had recognized the exception to the standing, rule when a litigant was asserting the First Amendment rights of third parties.
 
 Bigelow II,
 

 421 U.S. at 816
 
 ,
 
 95 S.Ct. 2222
 
 . Although the standing exception was not dispositive in
 
 Bigelow II
 
 because the General Assembly had amended the statute under constitutional attack, after the Supreme Court's decision in
 
 Bigelow II
 
 no Virginia case has questioned directly or indirectly the applicability of the standing exception in Virginia.
 

 The Court's most recent, and perhaps the most compelling, recognition of the standing exception occurred in
 
 Commonwealth v. Hicks,
 

 264 Va. 48
 
 ,
 
 563 S.E.2d 674
 
 (2002)
 
 ("Hicks I").
 
 In that case the majority applied the United States Supreme Court's exception to the standing rule reciting that "in the context of a First Amendment challenge, a litigant may challenge government action granting government officials standardless discretion even if that government action as applied to the litigant is constitutionally permissible."
 

 Id.
 
 at 55,
 
 563 S.E.2d at 678
 
 . The dissent in Hicks I, although concluding that the majority failed to consider whether the policy's overbreadth was sufficiently substantial, nevertheless, did not question the legitimacy of the standing exception, the exception which the majority abandons in this case.
 
 Id.
 
 at 64,
 
 563 S.E.2d at 683
 
 (Kinser, J., concurring in part and dissenting in part). If principles of precedent and stare decisis are to be applied, in my opinion, the unbroken recognition and application of the standing exception outweighs and belies a rule "established" in 1974 based on the dichotomy of commercial and non-commercial speech.
 

 Furthermore, my reading of
 
 Wayside Restaurant
 
 `does not lead me to the conclusion that the clear rule advocated by the majority was established in that case. Consider the critical part of the Court's opinion in
 
 Wayside Restaurant
 
 upon which the majority relies:
 

 The appellants advance a number of arguments that the ordinance is overbroad,
 
 i.e.,
 
 that it would proscribe the wearing of many types of socially acceptable wearing apparel and beach wear, and that dancing, as a form of expression, is speech protected by the First Amendment. The rule is that where, as here, a line can be clearly drawn between commercial and noncommercial conduct and it clearly appears that the prohibited activity is in the commercial area, the actor does not have standing to rely upon the hypothetical rights of those in the non-commercial zone in mounting an attack upon the constitutionality of a legislative enactment.
 

 Wayside Restaurant,
 

 215 Va. at 234-35
 
 ,
 
 208 S.E.2d at 54
 
 . Nothing in this passage indicates that the Court considered the third party rights asserted by restaurant owners as First Amendment rights. The Court did not cite Bigelow I as authority for the proposition so clearly stated by the Court in that case only two years earlier and which, at that time, was still the prevailing law on the issue. Furthermore, although the defendant restaurant companies asserted that topless dancing was a form of speech, the Court did not treat the activity as speech but only commercial conduct, stating that "[n]o evidence was presented which establishes that we are dealing with more than mere conduct, which is a fit subject of regulation under the police power, as opposed to a mixture of conduct and speech."
 
 Id.
 
 at 236,
 
 208 S.E.2d at 55
 
 . Accordingly, I do not view
 
 Wayside Restaurant
 
 as creating a "standing rule" precluding persons who engage in commercial activity from asserting the First Amendment rights of third parties when those rights are burdened by a constitutionally overbroad statute.
 

 Finally, when the Court in
 
 Wayside Restaurant
 
 drew a distinction between commercial and non-commercial speech, the law was unsettled regarding whether commercial speech was entitled to any constitutional protection. Indeed, in another Virginia case decided by the United States Supreme Court one year after
 
 Bigelow. I, Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,
 

 425 U.S. 748
 
 ,
 
 96 S.Ct. 1817
 
 ,
 
 48 L.Ed.2d 346
 
 (1975), the Commonwealth argued, as it had in
 
 Bigelow I and II,
 
 that commercial speech was outside the protection of the First Amendment. The Supreme Court acknowledged that past decisions gave "some indication that commercial speech is unprotected," citing
 
 Breard v. Alexandria,
 

 341 U.S. 622
 
 ,
 
 71 S.Ct. 920
 
 ,
 
 95 L.Ed. 1233
 
 (1951), as an example.
 
 Virginia State Board of Pharmacy,
 

 425 U.S. at 758
 
 ,
 
 96 S.Ct. 1817
 
 . The Court however, noted that by the time
 
 Bigelow II
 
 was issued, "the notion of unprotected `commercial speech' all but passed from the scene," and clearly held that commercial speech was entitled to protection under the First Amendment.
 
 425 U.S. at 759, 770
 
 ,
 
 96 S.Ct. 1817
 
 .
 
 Breard,
 
 the case cited by the United States Supreme Court as a case indicating that commercial speech was not entitled to any constitutional protection, was the same case cited by the Court in Wayside Restaurant in connection with the distinction between commercial and non-commercial speech.
 
 Wayside Restaurant,
 

 215 Va. at 235
 
 ,
 
 208 S.E.2d at 54
 
 .
 

 For these reasons I do not accord
 
 Wayside Restaurant
 
 the "apparent" precedential value given it by the majority, nor do I read the case as establishing a rule which has not been altered limiting the previously recognized exception to the standing rule in commercial
 speech cases. Rather, in my opinion, a fair reading of the cases of this Court supports the conclusion that the exception to the standing rule was recognized and applied as late as 2002 by this Court without any preclusion of litigants involved in commercial speech or conduct.
 

 The majority does not base its new standing rule solely on the "standing rule" of
 
 Wayside Restaurant.
 
 The majority, relying on the phrase in
 
 Virginia v. Hicks
 
 that the states are free to decide for themselves whether they want to recognize the standing exception,
 
 539 U.S. at 120
 
 ,
 
 123 S.Ct. 2191
 
 , concludes that our prior recognition of the exception was done under the mistaken belief that states had to recognize the standing exception adopted in the federal system. According to the majority, now freed from that mistaken belief, this Court is free to reexamine our position and, as, a matter of policy, should no longer allow such exception. Again I disagree.
 

 First, the statement by the Supreme Court in
 
 Virginia v. Hicks
 
 that states were not bound by the federal rules of standing,
 

 id.,
 

 is not a pronouncement of new law; it is nothing more than a statement of an obvious long standing principle.
 
 See ASARCO, Inc. v. Kadish,
 

 490 U.S. 605
 
 , 617,
 
 109 S.Ct. 2037
 
 ,
 
 104 L.Ed.2d 696
 
 (1989) (the standing requirements of federal courts do not apply to state courts, even when the state courts consider federal law).
 
 City of Los Angeles v. Lyons,
 

 461 U.S. 95
 
 , 113,
 
 103 S.Ct. 1660
 
 ,
 
 75 L.Ed.2d 675
 
 (1983) ("[S]tate courts need not impose the same standing or remedial requirements that govern federal [] court proceedings.") Of course, this Court can always change its mind, as the majority has done here. But such changes, in my opinion, should be made only after studied consideration of competing policies and the implications of the proposed change.
 

 The primary reason for the new standing policy, as expressed by the majority, is its belief that a litigant who engages in "unprotected" commercial speech should not be able to secure a "get out of jail free" card. While this may be an admirable policy as it relates to the litigant, there is no indication that the majority weighed its rationale or new policy against the danger or harm to society imposed by the overbroad statute. Thus, I can only surmise that the majority found those societal dangers of less importance and concluded that federal courts are a better or an acceptable venue for construing the constitutionality of Virginia statutes challenged on the basis of overbreadth.
 

 Furthermore, although the majority seems to deny standing to only one class of litigants - purveyors of deceptive commercial speech - this decision will, in my opinion, result in the complete eradication of the standing exception. Indeed, the majority specifically defines the defendant's activity as
 
 unprotected
 
 speech.
 
 [1]
 
 Indeed, by definition, the exception to the standing rule is only needed because the challenger seeking to raise the First Amendment rights of third parties is
 
 not
 
 engaged in protected speech or conduct. In all the cases of this Court, which the majority considers of no precedential value or irrelevant to the instant case because they did not involve commercial activity, the litigant was involved in unprotected activity.
 

 Because the rationale for the standing exception requires that one engaged in unprotected speech be allowed to raise the rights of those engaged in protected speech, I can find no principled basis for discriminating between the types of unprotected activity for purposes of applying the standing exception. Indeed, in light of the Court's decision today, it is difficult to imagine how this Court could,
 in the future, find a rational basis to allow a litigant engaged in unprotected speech or conduct to challenge a statute as unconstitutionally overbroad utilizing the standing exception. I can imagine no persuasive rationale for a policy that suggests a litigant engaged in unprotected commercial speech cannot qualify for the standing exception because that individual should not receive a "get out of jail free" card, but that a litigant engaging in any other unprotected activity could qualify for the exception. Consequently, although the majority may believe today's decision affects a limited number of defendants, in my opinion, the rationale underlying the majority's new classification will effectively eliminate the exception to the standing rule in all cases. As a result of this decision, those who wish to distribute their political views anonymously via the Internet must do so do under the threat of criminal prosecution and those who seek to challenge this statute or similar constitutionally suspect statutes must turn to the federal courts.
 

 Because I would continue this Court's prior policy of recognizing the exception to the standing rule, I would allow Jaynes to pursue his First Amendment claim that Code § 18.2-152.3:1 is overbroad. In considering Jaynes' First Amendment challenge, I con elude for the following reasons that the statute is unconstitutionally overbroad and therefore would reverse the judgment of the Court of Appeals and dismiss the charges against Jaynes.
 

 B.
 
 Constitutionality of Code § 18.2-152.3:1
 

 As shown by the record, because e-mail transmission protocol requires entry of an IP address and domain name for the sender, the only way such a speaker can publish an anonymous e-mail is to enter a false IP address or domain name. Therefore, like the registration record on file in the mayor's office identifying persons who chose to canvass private neighborhoods in
 
 Watchtower Bible & Tract Society v. Village of Stratton,
 

 536 U.S. 150
 
 ,
 
 122 S.Ct. 2080
 
 ,
 
 153 L.Ed.2d 205
 
 (2002), registered IP addresses and domain names discoverable, through searchable data bases and registration documents "necessarily result [ ] in a surrender of [the speaker's] anonymity."
 

 Id.
 

 at 166
 
 ,
 
 122 S.Ct. 2080
 
 . The right to engage in anonymous speech, particularly anonymous political speech, is "an aspect of the freedom of speech protected by the First Amendment."
 
 McIntyre v. Ohio Elections Comm'n,
 

 514 U.S. 334
 
 , 342,
 
 115 S.Ct. 1511
 
 ,
 
 131 L.Ed.2d 426
 
 (1995). By prohibiting false routing information in the dissemination of e-mails, Code § 18.2-152.3:1 infringes on that protected right. The Supreme Court has characterized regulations prohibiting such anonymous speech as "a direct regulation of the content of speech."
 

 Id.
 

 at 345
 
 ,
 
 115 S.Ct. 1511
 
 .
 

 State statutes that burden "core political speech," as this statute does, are presumptively invalid and subject to a strict scrutiny test.
 

 Id.
 

 at 347
 
 ,
 
 115 S.Ct. 1511
 
 . Under that test a statute will be deemed constitutional only if it is narrowly drawn to further a compelling state interest.
 

 Id.
 

 In applying this test, we must also consider that state statutes are presumed constitutional,
 
 City Council v. Newsome,
 

 226 Va. 518
 
 , 523,
 
 311 S.E.2d 761
 
 , 764 (1984), and any reasonable doubt regarding constitutionality must be resolved in favor of validity,
 
 In re Phillips,
 

 265 Va. 81
 
 , 85-86,
 
 574 S.E.2d 270
 
 , 272 (2003).
 

 There is no dispute that the statute was passed to control the transmission of unsolicited commercial bulk e-mail, generally referred to as SPAM. In enacting the federal CAN-SPAM Act, Congress stated that commercial bulk e-mail threatened the efficiency and convenience of e-mail.
 
 15 U.S.C. § 7701
 
 (a)(2). Many other states have regulated unsolicited bulk e-mail but have restricted such regulation to commercial emails.
 
 See e.g.,
 
 Ariz.Rev.Stat. § 44-1372.01; Ark.Code Ann. § 4-88-603; Cal. Bus. & Prof.Code § 17538.45;
 
 Fla. Stat. § 668.603
 
 ;
 
 Idaho Code § 48
 
 -603E; Ill. Comp. Stat., tit. 815 § 511/10; Ind.Code § 24-5-22-7;
 
 Kan. Stat. Ann. § 50-6
 
 , Md.Code Ann., Commercial Law § 14-3002. There is nothing in the record or arguments of the parties, however, suggesting that unsolicited non-commercial bulk e-mails were the target of SPAM filters, caused increased costs to the Internet service providers, or were otherwise a focus of the problem sought to be addressed by the Virginia legislation that became Code § 18.2-152.3:1.
 

 Jaynes does not contest the state's interest in controlling unsolicited commercial bulk email as well as fraudulent or otherwise illegal e-mail. Nevertheless, Code § 18.2-152.3:1 is not limited to instances of commercial or fraudulent transmission of e-mail, nor is it restricted to transmission of illegal or otherwise unprotected speech such as pornography or defamation speech. Therefore, the legislation is not narrowly tailored to protect the compelling interests advanced.
 

 C.
 
 Substantial Overbreadth
 

 The Commonwealth argues that enforcement of Code § 18.2-152.3:1 should not 136 precluded because, even if unconstitutionally overbroad, that remedy is limited to those statutes that are substantially overbroad. The concept of substantial overbreadth is not a test of the constitutionality of a statute, but a policy related to the remedy flowing from a successful facial challenge. A successful facial overbreadth challenge precludes the application of that statute in all circumstances. Recognizing the sweep of this remedy, the United States Supreme Court has stated that it will not impose such an expansive remedy where the chilling effect of an overbroad statute on constitutionally protected rights cannot justify prohibiting all enforcement of the law. "For there are substantial social costs created by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech. . . ."
 
 Virginia v. Hicks,
 

 539 U.S. at 119
 
 ,
 
 123 S.Ct. 2191
 
 . Thus a statute should be declared facially overbroad and unconstitutional only if the statute "punishes a `substantial' amount of protected free speech, `judged in relation to the statute's plainly legitimate sweep.'"
 

 Id.
 

 at 118-19
 
 ,
 
 123 S.Ct. 2191
 
 (citing
 
 Broadrick,
 

 413 U.S. at 615
 
 ,
 
 93 S.Ct. 2908
 
 ),
 

 The Commonwealth argues that Code § 18.2-152.3:1 is not substantially overbroad because it does not impose any restrictions on the content of the e-mail and "most" applications of its provisions would be constitutional, citing its application to unsolicited bulk commercial e-mail, unsolicited bulk email that proposes a criminal transaction, and unsolicited bulk e-mail that is defamatory or contains obscene images. According to the Commonwealth an "imagine[d] hypothetical situation where the Act might be unconstitutional as applied does not render the Act substantially overbroad." Prohibiting all anonymous political, religious, or other expressive speech as Jaynes asserts is not an insignificant "hypothetical situation." I reject the Commonwealth's argument that Jaynes' facial challenge to Code § 18.2-152.3:1 must fail because the statute is not "substantially overbroad."
 

 D.
 
 Narrowing Construction
 

 Our jurisprudence requires us to interpret a statute to avoid a constitutional infirmity.
 
 Burns v. Warden,
 

 268 Va. 1
 
 , 2,
 
 597 S.E.2d 195
 
 , 196 (2004). Nevertheless, construing statutes to cure constitutional deficiencies is allowed only when such construction is reasonable.
 
 Virginia Soc'y for Human Life v. Caldwell,
 

 256 Va. 151
 
 , 157,
 
 500 S.E.2d 814
 
 , 816-17 (1998). A statute cannot be rewritten to bring it within constitutional requirements.
 
 Reno v. ACLU,
 

 521 U.S. 844
 
 , 884-85 & nn. 49-50,
 
 117 S.Ct. 2329
 
 ,
 
 138 L.Ed.2d 874
 
 (1997);
 
 Virginia v. American Booksellers Ass'n,
 

 484 U.S. 383
 
 , 397,
 
 108 S.Ct. 636
 
 ,
 
 98 L.Ed.2d 782
 
 (1988).
 

 According to the Commonwealth, Code § 18.2-152.3:1 could avoid constitutional infirmity through a declaration that the statute does not apply to "unsolicited bulk non-commercial email that does not involve criminal activity, defamation or obscene materials." Alternatively the Commonwealth suggests that the statute be construed to apply only in instances where the receiving Internet service provider "actually objects to the bulk email."
 

 The construction urged by the Commonwealth is not a reasonable construction of the statute. Nothing in the statute suggests the limited applications advanced by the Commonwealth. The Commonwealth's suggested construction requires rewriting Code § 18.2-152.3:1. That task is one for the General Assembly, not the courts.
 

 E.
 
 Trespass
 

 The Commonwealth also argues that Code § 18.2-152.3:1 is like a trespass statute, prohibiting trespassing on the privately owned e-mail servers through the intentional use of false information and that no First Amendment
 protection is afforded under these circumstances. I disagree.
 

 Trespass is the unauthorized use of or entry onto another's property.
 
 See e.g., Vines v. Branch,
 

 244 Va. 185
 
 , 190,
 
 418 S.E.2d 890
 
 , 894 (1992) ("Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in
 
 trespass,
 
 trover, detinue, or assumpsit."); Code § 18.2-119, -125, -128, -132.
 

 Code § 18.2-152.3:1 does not prohibit the
 
 unauthorized
 
 use of privately owned e-mail servers. It only prohibits the intentional use of false routing information in connection with sending certain e-mail through such servers. Thus, even if an e-mail service provider specifically allowed persons using false IP addresses and domain names to use its server, the sender could be prosecuted under the statute although there was no unauthorized , use or trespass. Therefore, Code § 18.2-152.3:1 is not a trespass statute.
 

 The Commonwealth's argument that there is no First Amendment right to use false identification to gain access to private property is inapposite. First, in making this argument the Commonwealth uses the terms "false" and "fraudulent" interchangeably. Those concepts are not synonymous.
 
 [2]
 
 At issue here is the statute's prohibition of "false" routing information. Second, the cases upon which the Commonwealth relies are civil cases between Internet service providers and the entities engaged in sending commercial unsolicited bulk e-mails:
 
 America Online, Inc. v. IMS,
 

 24 F.Supp.2d 548
 
 (E.D.Va.1998),
 
 CompuServe, Inc. v. Cyber Promotions, Inc.,
 

 962 F.Supp. 1015
 
 (S.D.Ohio 1997), and
 
 Cyber Promotions, Inc. v. American Online, Inc.,
 

 948 F.Supp. 436
 
 (E.D.Pa. 1996). In litigation between these private parties, the courts have held that the unauthorized use of the Internet service providers' property constituted common law trespass and that a First Amendment claim could not be raised against the owner of private property. These cases have no relevance here because this is not a trespass action by a private property owner and the First Amendment right is not being asserted against the owner of private property, but against government action impacting the claimed First Amendment right.
 

 F.
 
 Conclusion
 

 For the reasons stated, I would find Code § 18.2-152.3:1 unconstitutionally overbroad on its face because it prohibits the anonymous transmission of all unsolicited bulk emails including those containing political, religious or other speech protected by the First Amendment to the United States Constitution. I would therefore reverse the judgment of the Court of Appeals and vacate Jaynes' convictions of violations of Code § 18.2-152.3:1.
 

 ---------------
 

 2.
 
 Fraud is a knowing misrepresentation made to induce another to act to his detriment.
 
 Klaiber v. Freemason Assocs.,
 

 266 Va. 478
 
 , 485,
 
 587 S.E.2d 555
 
 , 558 (2003).
 

 ---------------
 

 Simple Mail Transfer Protocol (SMTP) is what an e-mail server uses to transmit an e-mail message, and the SMTP requires verification of the sender's IP address and domain. Evidence at trial demonstrated that Jaynes sent the e-mails with nonexistent domains which did not correspond to the sending IP addresses.
 

 1.
 
 I do not agree with the majority's conclusion that Jaynes' commercial speech was "unprotected" because the routing information was false. Commercial speech is afforded constitutional protection based on the informational function of advertising. When such information does not accurately inform the public about lawful activity, it is not entitled to constitutional protection and may be banned.
 
 Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,
 

 447 U.S. 557
 
 , 563-64,
 
 100 S.Ct. 2343
 
 ,
 
 65 L.Ed.2d 341
 
 (1980). The routing information at issue here, while false, is not part of the commercial speech aimed at the recipient of the e-mail and indeed, if appearing on the e-mail at all, is likely not to be even noticed by the recipient. It is not, in my opinion, inaccurate information about a lawful activity that is not entitled to constitutional protection `as commercial speech.
 

 Computers may be identified by their unique IP address number, which consists of blocks of numerals separated by periods.
 

 Although Jaynes advertised only three products, he created false sender information for each e-mail, using thousands of different II) addresses, user names and website links.
 

 Jaynes' enterprises were apparently quite successful. Although not introduced as evidence during the guilt stage of the trial, counsel for the Commonwealth informed the Court following the jury verdict against Jaynes and during the discussion of bond for Jaynes that Jaynes'"[p]ersonal financing statement list[s] assets at $17' million and a net worth of $24 million," and his income from all of his businesses exceeded $1 million in 2001, 2002 and 2003.
 

 The data on the disc contained, among other things, "a raw dump of the AOL member database" which "contains information about [AOL] subscribers, how they choose to be billed, their email address, specific AOL data fields such as an account number, things of that nature."
 

 At trial, evidence demonstrated that all of AOL's servers were located in Virginia, although some were located in Loudoun County and others were located in. Manassas.
 

 The misdemeanor provisions of Code § 18.2-152.3:1(A) are not before the Court.
 

 Unlike a "facial" or "as applied" challenge, an overbreadth challenge "suffices to invalidate all enforcement of that law" upon showing that the law "punishes a `substantial' amount of protected free speech, `judged in relation to the statute's plainly legitimate sweep.'"
 
 Hicks,
 

 539 U.S. at 118-19
 
 ,
 
 123 S.Ct. 2191
 
 (2003) (quoting
 
 Broadrick v. Oklahoma,
 

 413 U.S. 601
 
 , 615,
 
 93 S.Ct. 2908
 
 ,
 
 37 L.Ed.2d 830
 
 (1973)).
 

 Jaynes also relies upon our opinions in
 
 Gray v. Commonwealth,
 

 260 Va. 675
 
 , 681,
 
 537 S.E.2d 862
 
 , 865 (2000) (holding "[d]efendant has no standing to mount a broad, general, facial statutory challenge because he does not contend his conduct was constitutionally protected nor is the First Amendment implicated"),
 
 Esper Bonding Co. v. Commonwealth,
 

 222 Va. 595
 
 , 597,
 
 283 S.E.2d 185
 
 , 186 (1981) (confirming general rule for standing and noting limited exceptions, including in the First Amendment context), and
 
 Owens v. Commonwealth,
 

 211 Va. 633
 
 , 638-39,
 
 179 S.E.2d 477
 
 , 481 (1971) (finding standing to assert First Amendment overbreadth claim regarding a statute which restricted the right to assemble), to support his claim that Virginia allows overbreadth standing in all cases which might implicate the First Amendment.
 

 The dissent's reference to
 
 Commonwealth v. Hicks,
 

 264 Va. 48
 
 ,
 
 563 S.E,2d 674
 
 (2002) ("
 
 Hicks I
 
 ") is misplaced as that case did not involve commercial speech.
 

 As Jaynes has no, standing under this standard, we do not decide today the continuing precedential effect, if any, of
 
 Wayside Restaurant.
 
 The exception to standing we announce today is narrow and directed. Accordingly, we note that the dissent's statement that "this decision will . . . result in the complete eradication of the standing exception" has no basis in our decision and is unfounded.
 

 See also Greater New Orleans Broad. Ass'n v. United States,
 

 527 U.S. 173
 
 , 183,
 
 119 S.Ct. 1923
 
 ,
 
 144 L.Ed.2d 161
 
 (1999) (confirming that "[f]or commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading");
 
 44 Liquormart v. Rhode Island,
 

 517 U.S. 484
 
 , 496,
 
 116 S.Ct. 1495
 
 ,
 
 134 L.Ed.2d 711
 
 (1996) (confirming that commercial speech is protected when it is "accurate," "truthful and nonmisleading").
 

 Commonwealth v, Hicks,
 
 sometimes referenced as
 
 Hicks II,
 
 was the case subsequent to
 
 Virginia v. Hicks,
 

 539 U.S. 113
 
 ,
 
 123 S.Ct. 2191
 
 ,
 
 156 L.Ed.2d 148
 
 (2003) and was considered by this Court on remand from the United States Supreme Court. For purposes herein, we will reference this case as
 
 Hicks II.
 

 Jaynes' counsel admitted during oral argument before this Court that the statutory reference to "bulk" was clearly defined.
 

 A misdemeanor conviction under Code § 18.2-152.3:1, subsection (A), is not before us in this appeal, and we express no opinion as to whether that subsection of the statute may be unconstitutional based on vagueness.
 

 Furthermore, it is highly unlikely that the sender of an e-mail which is passed through a router or server in Virginia at the direction of
 
 another router or server
 
 would be subject to criminal prosecution. Such an actor shares little in common with Jaynes who directed and insured that the AOL servers would be used to transmit his e-mails and thus, as discussed above, vested jurisdiction in Virginia courts.